William R. VAN GEMERT et al., Appellants,

v.

The BOEING CO. et al., Appellees.

Nos. 321–325, Dockets 74–1157 to 74–1159, 74–1165 and 74–1185.

United States Court of Appeals,
Second Circuit.

Argued Feb. 26, 1975.

Decided July 14, 1975.

Stuart D. Wechsler, Kass, Goodkind, Wechsler & Gerstein, New York City, Sachnoff, Schrager, Jones & Weaver, Ltd., Elson, Lassers & Wolff, Chicago, Ill., for appellants.

Norman Winer, Nathan, Mannheimer, Asche, Winer & Friedman, New York City, for appellants.

S. Hazard Gillespie, Davis, Polk & Wardwell, New York City (David E. Wagoner, Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., William H. Levit, Jr., Hughes, Hubbard & Reed, Los Angeles, Cal., of counsel), for appellees.

Before LUMBARD, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a judgment dismissing the amended complaint in a consolidation class action brought by nonconverting holders of The Boeing Company's "4½% Convertible Subordinated Debentures, due July 1, 1980." The complaint was jurisdictionally based on the Securities Exchange Act of 1934 as amended, the Securities Act of 1933 as amended, the Trust Indenture Act of 1939 as amended and the principles of pendent jurisdiction.[1] The gist of the complaint was that the appellants and their class had inadequate and unreasonable notice of Boeing's intention to redeem or "call" the convertible debentures in question and were hence unable to exercise their conversion rights before the deadline in the call of midnight, March 29, 1966. Their damage lay in the fact that the redemption price for each $100 of principal amount of debentures was only $103.25, while under the conversion rate of, at a minimum, two shares of common stock for each $100 of principal amount of debentures, the stock was worth $316.25 on March 29, 1966, the cut-off date for the exercise of conversion privileges, or within 30 days

---

1. See note 19 *infra*.

thereafter, $364.00. The named appellants number 56, and the total loss alleged is over $2 million.

The United States District Court for the Southern District of New York, Sylvester J. Ryan, *Judge,* held that Boeing complied with the notice provisions spelled out in the debentures and in the Indenture of Trust Dated July 1, 1958 (the Indenture), between Boeing and The Chase Manhattan Bank (Chase), Trustee, and that it was required to do no more; that the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa *et seq.,* was not violated; that if Boeing's Listing Agreement with the New York Stock Exchange (NYSE) were violated, it gave appellants no claim for relief; and that even if, as appellants claim, an adjustment in the conversion rate were required, and that failure to make the adjustment gave rise to a cause of action, appellants had no standing to raise the claim since they did not exercise their conversion rights. We reverse and remand on the ground that there was an obligation on Boeing's part to give reasonably adequate notice of the redemption to the debenture holders, which obligation was not fulfilled in this instance.

Most of the facts are not in dispute; indeed, we commend the parties, and the court below, for agreeing to a 59-page statement as to facts, incorporating some 55 exhibits, and to what certain witnesses would testify if called at trial.

THE ISSUE OF DEBENTURES

On July 15, 1958, each Boeing shareholder was given the right to purchase $100 of convertible debentures for each 23 shares of stock then held.[2] The debentures were to pay interest of 4½ per cent per annum and were to be convertible by the debenture-holder into common stock at a rate (subject to adjustment) of two shares per $100 principal amount of debentures. Chase was appointed trustee under the Indenture Agreement, and the debentures, as well as the stock reserved for issuance upon conversion of the debentures, were listed on the NYSE. Application for such listing had been made pursuant to a Listing Agreement between Boeing and the Exchange.

Subscriptions for a total of $29,578,500 of debentures were received[3] and the balance of $1,019,100 was purchased by the underwriters. Chase as trustee then authenticated and the subscription agent delivered by registered mail the entire $30,597,600 aggregate amount of debentures in coupon form to the persons designated in the warrants surrendered or their agents,[4] but no list of these was kept by Boeing or Chase.[5]

A number of provisions in the debenture, the Indenture Agreement, the prospectus, the registration statement for the debentures and the Listing Agreement with the NYSE dealt with the possible redemption of the debentures by Boeing and the notice debenture-holders were to receive of a redemption call so that they might timely exercise their right to convert the debentures into common stock rather than have their debentures redeemed at face value. The debentures themselves provided:

2. Total trading in the debenture rights was 1,702,200, but since no information is available on the number or retrades there is no way of knowing exactly how many rights were not traded. At the least, however, 5,335,248 rights were not traded on the Exchange.

3. One may estimate, from the number of rights not traded on the Exchange, approximately $21 million worth of the debentures were purchased by Boeing stockholders or their donees.

4. Between August 4, 1958, when the debentures were admitted to trading on the NYSE, and March 29, 1966, when conversion rights expired, a total of $68,694,000 face amount of debentures were traded. It is not known how

many of the debentures were held by original subscribers at the later date.

5. City Bank-Farmers Trust Company, the subscription agent, retained through the ultimate date on which conversion rights expired the names and addresses of stockholders to whom the warrants were sent, as well as lists of the names and addresses of stockholders of record for the payment of dividends in May and August of 1958, and the warrants themselves when they were tendered. Although the list of stockholders was destroyed in 1964, the warrants which bear the names and addresses of the original subscribers are presently in the possession of a successor agent.

The holder of this Debenture is entitled, at his option, at any time on or before July 1, 1980, or in case this Debenture shall be called for redemption prior to such date, *up to and including but not after the tenth day prior to the redemption date, to convert this Debenture* . . . at the principal amount hereof, or such portion hereof, into shares of Capital Stock of the Company . . .

. . . . .

The Debentures are *subject to redemption* as a whole or in part, at any time or times, at the option of the Company, *on not less than 30 nor more than 90 days' prior notice, as provided in the Indenture,* at the following redemption prices (expressed in percentages of the principal amount) . .

. . . . .

This Debenture may be registered as to principal upon presentation at the office or agency of the Company, in the Borough of Manhattan, The City of New York, New York, . . .

(Emphasis added.)

The Indenture itself, a 113-page printed booklet, provides in Art. V, § 5.02, as follows:

In case the Company shall desire to exercise the right to redeem all or any part of the debentures, as the case may be, pursuant to Section 5.01, it shall publish prior to the date fixed for redemption a notice of such redemption at least twice in an Authorized Newspaper, the first such publication to be not less than 30 days and not more than 90 days before the date fixed for redemption. Such publication shall be in successive weeks but on any day of the week. . . [6]

The Indenture also provided that debenture-holders who registered their bonds would receive notice by mail of any redemption call by the Boeing directors.

While the prospectus for the debenture issue did not refer to any registration rights, it did state that redemption could occur "on not less than 30 days' and not more than 90 days' published notice."

The NYSE Listing Agreement dated November 5, 1957, incorporated by reference into the listing application filed by Boeing in respect to the debenture issue, provided in Part III, Paragraph 4, as follows:

4. The Corporation will *publish immediately to the holders* of any of its securities listed on the Exchange *any action taken* by the Corporation *with respect* to dividends or to the allotment of rights to subscribe or *to any rights or benefits pertaining to the ownership of its securities listed on the Exchange;* and will give prompt notice to the Exchange of any such action; and *will afford the holders of its securities listed on the Exchange a proper period within which* to record their interests and *to exercise their rights.* . . .

(Emphasis added.)

Section A10 of the NYSE "Company Manual" specifically defines what is meant by publicity in the Listing Agreement:

Publicity: *The term "publicity,"* as used . . . below, and *as used in the listing agreement* in respect of redemption action, *refers to a general news release, and not to the formal notice or advertisement of redemption* sometimes required by provisions of an indenture or charter.

*Such news release shall be made as soon as possible after corporate action which will lead to, or which looks toward, redemption* is taken . . . and shall be made by the fastest available means, i. e., telephone, telegraph or hand-delivery.

To insure coverage which will adequately inform *the public,* the news should be released to at least *one or*

---

6. An "Authorized Newspaper" is defined as one published at least five days a week and of general circulation in the borough of Manhattan, N.Y. *See* Indenture, Art. I, § 1.01.

*more newspapers of general circulation in New York City which regularly publish financial news, or to one or more of the national news-wire services* (Associated Press, United Press International), in addition to such other release as the company may elect to make.

Section A10 of the Company Manual also provides specifically that when a convertible security is to be redeemed, the news release must include the rate of conversion and the date and time when the conversion privilege expires. It further provides that in addition to the immediate news release the company must give notice immediately to the NYSE itself, so as to enable the NYSE to take any necessary action with respect to further trading in the security.

## THE CALL AND ITS CIRCUMSTANCES—HEREIN OF THE NOTICE ACTUALLY GIVEN

On February 28, 1966, the Boeing board of directors *inter alia* authorized the president, vice president-finance or treasurer to call for redemption on a date to be selected by them or any one of them, all of the convertible debentures outstanding under the indenture of July 1, 1958. That same day a news release, headlining 1965 sales and net earnings, and referring to a contemplated stock increase, stock split and post-split dividends, mentioned that "[t]he company's management was also authorized to call for redemption at a future date all of the company's outstanding 4½ percent convertible subordinated debentures." This statement, which did not mention even the tentative dates for redemption and expiration of the conversion rights of debenture holders that had been settled upon, was released by the Boeing "News Bureau" nationally to the financial editors of the New York Times, the New York Herald-Tribune, the Wall Street Journal and other major national newspapers, in addition to the major wire services (Associated Press, United Press International and Dow Jones & Co.).

A short time after the February 28 board meeting, Boeing firmed up the key dates, complied with the indenture notice requirements and communicated to some extent with the Exchange proper. On March 2, 1966, at the home office in Seattle, at a meeting of Boeing officers, bankers and lawyers, it was decided to fix March 8 as the date for the first publication of the formal notice of redemption, April 8 as the redemption date and March 29 as the date for expiration of the conversion privilege. The second date for publication of the formal notice, March 18, was also fixed upon at this March 2 meeting, and Chase was notified to publish the redemption notice on those dates in all editions of the Wall Street Journal. All editions of the Journal carried the formal notices on March 8 and 18; the notices were in due form if not of extensive size.[7] It is conceded by the appellants that the formal requirements of the Indenture were met by the Company and Trustee.

It was not until March 7, the day before the publication of the first formal notice of redemption, that the NYSE was itself notified of the firmed-up dates for redemption,[8] conversion and notice. This was done by a telephone call from Company counsel in Seattle to the Exchange. While the court below found in part that "Boeing did comply with the publicity requirements of the Exchange" and while Company counsel "felt" on the basis of his telephone call "that we had complied with the recommended procedures [of the Stock Exchange Manual]," this finding and feeling are in the face of Boeing's response *admitting* appellants' demand for admission

That Boeing did not issue any general publicity release, as that term is

---

7. We estimate their size as 5" x 5½".

8. The Exchange had been sent a communication concerning the redemption on March 1, 1966, but at that time no redemption date had been established.

defined in Section A–10 of the New York Stock Exchange Company manual, concerning the call of the debentures during the period from March 1, through March 24, 1966.

This admission was reconfirmed by counsel for Boeing below and on appeal in the course of an "opening" statement to the court. The original news release of February 28 did not qualify since the dates of conversion and redemption had not been fixed and the Manual requires in the case of convertible securities that the publicity set forth "the rate of conversion and the date and time when the conversion privilege will finally expire" and that if such data are not known at the time publicity is given initially, "similar publicity shall be given immediately it becomes known or determined." The formal notices did not qualify since the Manual refers to a "general news release," and not to the formal notice or advertisement of redemption. In this regard it is interesting to note that a letter dated March 9 from the stock list department of the Exchange to Boeing indicates that "We have noted the recent advertisement advising of the call for redemption" and also asks for a copy of the authorizing resolution.

There was, in short, no general news release as called for by the Listing Agreement as amplified in the Company Manual until on the eve of expiration of the conversion rights, March 25, 1966, it appeared that $10,849,300 face amount of debentures—over one-half of those outstanding at that time—remained unconverted. At that point Boeing issued a press release[9] and then on March 28 the Company republished its earlier advertisement in all editions of the Wall Street Journal (Eastern, Mid-Western, Pacific Coast and South-West) and the New York Times, and additional advertisements were placed. This later action had what the court below termed a "dramatic and widespread rippling effect." Some $9,305,000 of debentures were converted on March 28 and 29. The ripples, however, had not spread to the appellants' class by the midnight deadline on the 29th; they literally went to sleep with $1.5 million of debentures that were worth $4 million if only converted.

It is true, however, and the court did properly find, that in addition to the publication of the two formal indenture notices, notices of the dates of the call and the expiration of the conversion privilege on March 29, 1966, were carried on the following services: NYSE ticker on March 8, 23, 24, 25, 26 and 28, 1966; NYSE Bulletin on March 11, 18 and 25, 1966; The Commercial and Financial Chronicle on March 14, 21 and 28, 1966; Standard & Poor's Bond Outlook on March 19, 1966; Standard & Poor's Called Bond Record on March 9, 11, 18 and 25, 1966; Moody's Industrials on March 11, 1966. Articles about these dates were also carried in the Seattle Post Intelligencer on March 25, 1966; the Seattle Times on March 27, 1966; and the Financial World on March 23, 1966; and the notice was also carried in the Associated Press Bond Tables published on one or more days in at least 30 newspapers published in major cities

---

**9.** DEBENTURE CONVERSION DATE MARCH 29

Final date for conversion of The Boeing Company's 4½ per cent convertible subordinated debentures to Boeing common stock is Tuesday, March 29, as announced in advertising by the company on March 8, 9 and 10.

The conversion rights provide for issuance of two shares of common stock in the company for each $100 bond. The company's notice of redemption announced that all outstanding debentures would be redeemed on or after April 8 at the redemption price of 103.25 per cent of their principal amount, together with accrued interest to that date.

Closing price of the stock as of March 25 was $154.5, representing a substantial advantage to holders of the bonds if the conversion is elected.

From January 1, 1965 through March 25, 1966, the sales price for the common stock of The Boeing Company ranged from a high of $175.25 to a low of $60.375 per share. As was pointed out in the notice of redemption, so long as the market price of the common stock is $52.24 or more per share, a debenture holder would receive upon conversion before the March 29 deadline, common stock having a greater value than the cash he would receive if he surrendered the debenture for redemption.

across the United States. But almost all of these notices or items were in fine print, buried in the multitude of information and data published about the financial markets and scarcely of a kind to attract the eye of the average lay investor or debenture holder. On March 9, 1966, the listing in the New York Times for the convertible debentures read, for example: "Boeing cv 4½ s 80." The change on March 10 was to "Boeing 4½ s 80 cld," giving the investor in Dubuque or Little Rock or Lampasas only 19 days to pick up this change and figure that "cld" meant "called." Proof of the inadequacy of these notices lies in the fact that, despite the dramatic disparity between the value of the debentures unconverted and the conversion stock, over one-half of the debentures outstanding on the date of the first notice remained unconverted until the general publicity release on the eve of expiration of the conversion privilege.[10]

Because the appellants place some emphasis on the fact, although we do not reach their contention of unreasonable notice based on it, we should mention that Boeing made no attempt to mail notice to the original subscribers (which could have been done at concededly nominal expense), and neither Boeing nor Chase inquired of or gave notice to collecting banks which had tendered for collection coupons bearing the payment dates of July 15, 1965, or January 15, 1966, the last two coupons before the redemption, either of which might have had some beneficial effect.[11]

THE CONTENTIONS OF THE PARTIES

Boeing rests its defense primarily upon the notice specified in the debentures and Indenture, pointing out that in 1958 when the debentures were issued, "the risk that actual notice might not be received by subsequent holders of the debentures was clearly accepted by all even remotely familiar with the nature of such debentures." (Brief at 20–21.) It was "just such a risk" that led Boeing to extend to its stockholders and others who were investing $30 million in these securities the opportunity to register, see Kaplan v. Vornado, Inc., 341 F.Supp. 212, 216 (N.D.Ill.1971), an opportunity availed of by only 7 per cent of the debenture holders.[12] For the proposition that notice by publication provided for here was "standard and conformed with the custom and practice prevailing in the trade in 1958," we are referred by Boeing to Gampel v. Burlington Industries, Inc., 43 Misc.2d 846, 252 N.Y.S.2d 500 (Sup.Ct. 1964), where Justice Korn did not discuss the custom and practice in the trade but did hold that publication in the Wall Street Journal even during a newspaper delivery strike conformed to a provision in the Burlington Industries debentures similar to the one in the case at bar.[13]

There are four main strings to the appellants' bow. The first is that Boeing is civilly liable under federal law for violation of the NYSE Listing Agreement and Section A10 of the NYSE Company Manual since their requirements are an extension of the Securities Exchange Act of 1934 and an integral part of the statutory scheme under which exchanges are required to adopt rules, 15 U.S.C. § 78f, which may be ordered by the Commission to be altered, 15 U.S.C. § 78s, and the violation of which may give rise to a civil action under federal law. Cf. Buttrey v. Merrill Lynch,

10. On March 8, 1966, $21,514,700 face amount of debentures were still outstanding. On March 25, 1966, as stated, four days before the expiration of the conversion privilege, over one-half of these $10,849,300, had not been converted.

11. Nor do we reach the legal argument under the Trust Indenture Act, 15 U.S.C. § 77bbb, based upon the Indenture's provisions requiring Boeing to give Chase lists of the names and addresses of debenture holders obtained

by the former, and the token compliance therewith.

12. Through April 8, 1966, $1,838,000 in face amount of the debentures were registered as to principal and interest and $337,700 as to principal only; thus, approximately 7 per cent of the debentures were in fact registered so that their holders thereby automatically received notice from the trustee.

13. See generally Miller, How to Call Your Convertibles, Har.Bus.Rev. 66 (May/June 1971).

*Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir.), *cert. denied,* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). The second is that appellants are third party beneficiaries under state law of the Boeing-NYSE Listing Agreement, as amplified by the Company Manual. *Lawrence v. Fox,* 20 N.Y. 268 (1859). *See Weinberger v. New York Stock Exchange,* 335 F.Supp. 139 (S.D.N.Y.1971) (Gurfein, J.) (Exchange liable under agreement with SEC to limited partner of bankrupt member firm inadequately supervised by Exchange.) The third claim of appellants is that the Indenture is in the nature of a contract of adhesion, a standardized contract between parties of disparate bargaining power, unconscionable features of which are unenforceable as a matter of policy, a concept perhaps first advanced as to indentures of trust covering convertible debentures in a student note, *Convertible Securities: Holder Who Fails to Convert Before Expiration of the Conversion Period,* 54 Cornell L.Rev. 271 (1969). *Cf. Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 269, 54 Cal. Rptr. 104, 107, 419 P.2d 168, 171 (1966). *See* Kessler, *Contracts of Adhesion— Some Thoughts About Freedom of Contract,* 43 Colum.L.Rev. 629 (1943). The fourth ground is that the call was illegal and therefore void because it was based upon a conversion rate of 2.00 shares per $100 face amount of debentures when as a result of two stock dividends and an acquisition it should have been on a 2.05 or a 2.08 ratio.

## THE FEDERAL LAW CLAIM

■ The claim that Boeing is civilly liable under federal law for violation of the NYSE Listing Agreement and Section A10 of the Company Manual is a colorable one. The Listing Agreement and Company Manual are "instruments corresponding" to rules of the Exchange within Section 6(a)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78f(a)(3). For the debentures here in question to be listed on the Exchange, application under the Listing Agreement had to be made. Boeing did not comply

with the publicity requirements of the Exchange. In *O'Neill v. Maytag,* 339 F.2d 764, 770 (2d Cir. 1964), we did say, however, in the context of a stockholder's derivative suit arising out of an air carrier's purchase of its own stock, that a transaction which violated an Exchange rule did not give rise to a cause of action under federal law, at least against a listed company or its officers.

But as the Supreme Court held in *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), private parties have both derivative and direct rights of action to bring suit for violations of the Securities Exchange Act of 1934 and SEC rules and regulations issued thereunder, rights the explication of which take up a fair amount of Second Circuit judicial time. We extended this at least by dictum to include violation of stock exchange and securities dealers' association rules designed for the direct protection of investors, at least in a suit against an Exchange member, in *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). There, Judge Friendly, speaking for a unanimous court, pointed out that "the concept of supervised self-regulation is broad enough to encompass a rule which provides what amounts to a substitute for a regulation by the SEC itself." 358 F.2d at 182. Again, "[a] particular stock exchange rule could thus play an integral part in SEC regulation notwithstanding the Commission's decision to take a backseat role in its promulgation and enforcement . . .," *id.,* giving as an example NYSE Rule 452 which prohibits a member from voting stock held in a street name without specific instructions from the beneficial owner. *Id.* at n. 4. Judge Friendly then went on to say that

> what emerges is that whether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on the simplistic all-or-nothing basis urged by the two parties; rather, the court must look to the

nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law.

*Id.*[14]  *See* Lowenfels, *Liability under Exchange Rules*, 2 Rev. of Securities Regulation 841 (1969). *See also Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* (upholding implied private right based upon the so-called "Know Your Customer" rule, which is Rule 405 of the NYSE, against a party not a stock exchange member).

Nevertheless, we do not now take the position that appellees advance and the court below apparently accepted, that violation of an exchange rule cannot under any circumstances give rise to civil liability under the federal acts. Such a position would be in conflict with our own most recent statements on this subject as well as some of the developing case law. *See, e. g.,* Judge Weinfeld's opinion in *Starkman v. Seroussi,* 377 F.Supp. 518 (S.D.N.Y.1974) (conduct in violation of Rule 345.17 of the Exchange prohibiting registered representatives from guaranteeing any customer against loss in his account or receiving a share in the profits or sharing in the losses of a custom-

er's account, held actionable); *SEC v. First Securities Co. of Chicago,* 463 F.2d 981 (7th Cir.), *cert. denied, McKy v. Hockfelder,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972) (violation of NASD rule protecting public gives rise to private damage action). *Cf. Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 164–66 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

It would also run contrary to a position we find inviting, that to the American investing public listing on the New York Stock Exchange carries with it implicit guarantees of trustworthiness. The public generally understands that a company must meet certain qualifications of financial stability, prestige, and fair disclosure, in order to be accepted for that listing, which is in turn so helpful to the sale of the company's securities. Similarly it is held out to the investing public that by dealing in securities listed on the New York Stock Exchange the investor will be dealt with fairly and pursuant to law. This would be particularly true as to the convertible securities market which differs from the market for other corporate debt in that it is composed primarily of individuals. *See* 1A Dewing, The Financial Policy of Corporations 268–71 (5th ed. 1953).[15] Some investors miss the notices of redemption and of expiration of conversion rights, while others "do not know that

**14.** The court went on to hold, however, that the rules at issue in *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), were "near the opposite pole," that is to say, they were "something of a catchall" which related to unethical behavior as well as illegal conduct. It is to be noted that *Colonial Realty* was not the first Second Circuit case dealing with stock exchange rules. In *Baird v. Franklin,* 141 F.2d 238 (2d Cir.), *cert. denied,* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), the court recognized that culpable failure by a stock exchange to enforce rules adopted pursuant to § 6(b) of the Securities Exchange Act might give rise to a federal claim against the *exchange* by an investor injured thereby. *See also Silver v. NYSE,* 302 F.2d 714, 719 (2d Cir. 1962), *rev'd on other grounds,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

**15.** The aggregate amount of convertible bonds outstanding of companies listed on the New York Stock Exchange in March of 1963, according to Standard & Poor's Earnings and Rating Bond Guide, was $2,300,000,000, of those listed on the American Stock Exchange $92,000,000, and of unlisted companies $880,-000,000. *See* 2 Report of Special Study of Securities Markets made pursuant to Section 19(d) of Securities Exchange Act of 1934 at 23. The Commission is well aware that individual shareholders to whom rights to subscribe to debentures are distributed by the corporations have no control over the time of distribution or whether there should be a distribution. Hence they are "participating in the market involuntarily, so to speak. . . ." *Id.* at 24.

they should look for them." Note, 54 Cornell L.Rev. at 274 n. 16.[16]

▮ Appellees argue, however, that the self-regulation system of the 1934 Act applies in its terms only to Exchange *members*, as opposed to *issuers*, and that the legislative history indicated congressional intention not to extend coverage of the Exchange rules and regulations to issuers. In this connection appellees maintain that Congress did consider such an extension as evidenced by a proposed § 12(b)(1) to the Securities Exchange Act quoted in Cong.Rec. 8584 (1934), which was never adopted. *Id.* at 8586. The provision, however, was to require listed companies to agree with the Exchange to comply with the Exchange Act and the Commission's rules and regulations, and much of the debate related to whether the provision was necessary at all since such companies would have to comply with the law re-gardless of any such agreement.[17] Omitting the section in question would apparently indicate merely a recognition that the provision was unnecessary. The legislative history is thus at most equivocal on the question whether Congress intended to insulate issuers from liability in the event that they violated an Exchange rule.[18]

▮ Appellees argue also that the Exchange's remedies are limited to delisting. *See* Report of Special Study of Security Markets of the Securities and Exchange Commission, H.R.Doc. No. 95, 88th Cong., 1st Sess., Pt. IV, ch. XII at 566–67; *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), *cert. denied*, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972) (permitting delisting). But no authority holds that the exclusive remedy against a listed company is delisting. The claim for relief is sufficient for jurisdictional purposes in any event.[19]

---

**16.** Cases involving generally broad standards of conduct and having nothing to do with disclosure, *see, e. g., Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417 (N.D.Cal.1968), *modified on other grounds*, 430 F.2d 1202 (9th Cir. 1970), require the presence of fraud to create a right of action under federal law, but this is because the only action or conduct proscribed by the rule is fraudulent conduct. Here, however, is involved a notice or notification rule.

**17.** Senator Hastings made the following statement in connection with the legislation:

> I do not quite understand why they want to get the issuer of the security on record, in the form of an agreement, not to violate a particular law, because it must be admitted that, if the law itself is valid, and if the rules and regulations made by the commission are valid, and the person entering into the agreement has brought himself within the law by offering his securities for sale, then certainly, it seems to me, the point of compelling him to sign a paper that he will abide by the laws and rules made by the commission must have back of it something which those of us who studied the bill do not quite understand.

78 Cong.Rec. at 8585 (1934). While Senator Hastings' amendment was defeated, the language he objected to was deleted in conference.

**18.** Provisions of the Listing Agreement requiring the corporation to, *e. g.*, "promptly notify the Exchange of any changes of officers or directors," Part I, 2, would not seem to give rise in any event to a liability to a securities holder. The provisions of the Listing Agreement here in question, however, were to "afford the holders of its securities listed on the Exchange a proper period within which . . to exercise their rights. . . . ."

**19.** *United Mine Workers v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See Hudak v. Economic Research Analysts, Inc.*, 499 F.2d 996, 1001 (5th Cir. 1974); *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 129 (7th Cir. 1972). The writer of the opinion for himself alone would hold that even if there were such a duty it would be essentially coterminous with a contractual duty to the appellants as third party beneficiaries. As he views it, the limited notification provisions of the Indenture and debenture were modified by virtue of the application for listing on the stock exchange, which specifically incorporated by reference the Listing Agreement of November 5, 1957, to which we have so frequently alluded. *See Lawrence v. Fox*, 20 N.Y. 268 (1859); *Seaver v. Ransom*, 224 N.Y. 233, 120 N.E. 639 (1918); *Weinberger v. NYSE*, 335 F.Supp. 139 (S.D.N.Y.1971). The duty of a listed company to its own securities holders to treat them fairly is founded in fundamental concepts of the law pertaining to corporate fiduciaries. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Pep-*

## THE INADEQUACY OF THE BOEING NOTICE

■ The notice Boeing gave, we hold, had two deficiencies. First, Boeing did not adequately apprise the debenture holders what notice would be given of a redemption call. Investors were not informed by the prospectus or by the debentures that they could receive mail notice by registering their debentures, and that otherwise they would have to rely primarily on finding one of the scheduled advertisements in the newspaper or on keeping a constant eye on the bond tables. Second, the newspaper notice given by Boeing was itself inadequate.

The first factor we think highly significant. Many of the debenture holders might well have decided to register their bonds, had the significance of registration, or of the failure to register, been brought home in the materials generally available to the purchasers of the debentures. No detailed information as to notice was given on the face of the debentures, even in the fine print. The debentures stated simply:

> The debentures are subject to redemption, as a whole or in part, at any time or times, at the option of the Company, in not less than 30 nor more than 90 days' prior notice, as provided in the Indenture  .  .  .

There was no indication that registration would mean that a debenture holder would receive mail notice. Nor was there any indication of the extent of newspaper notice to be provided—either as to the papers that would be used or how often the notice would be published. Debenture holders were simply referred by the debenture, as well as by the prospectus, to the 113-page Indenture Agreement, which, to be sure, was available to debenture holders or prospective purchasers upon request, but which was not circulated generally with the warrants or debentures.

■ We have dwelt at length in the facts on the newspaper notice actually given. While it may have conformed to the requirements of the Indenture it was simply insufficient to give fair and reasonable notice to the debenture holders.

■ The duty of reasonable notice arises out of the contract between Boeing and the debenture holders, pursuant to which Boeing was exercising its right to redeem the debentures. An issuer of debentures has a duty to give adequate notice either on the face of the debentures, *Abramson v. Burroughs Corp.*, CCH Fed.Sec.L.Rep. [1971–72 transfer binder] ¶ 93,456 (S.D.N.Y.1972) (Lumbard, *C. J.*, sitting by designation), or in some other way, of the notice to be provided in the event the company decides to redeem the debentures. Absent such advice as to the specific notice agreed upon by the issuer and the trustee for the debenture holders, the debenture holders' reasonable expectations as to notice should be protected.

For less sophisticated investors (it will be recalled that warrants for the purchase of debentures were issued to *all* Boeing shareholders), putting the notice provisions only in the 113-page Indenture Agreement was effectively no notice at all. It was not reasonable for Boeing to expect these investors to send off for, and then to read understandingly, the 113-page Indenture Agreement referred to in both the prospectus and

per v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). Security holders of a corporation are in a very real sense creditor beneficiaries, *see* 1 Restatement of Contracts § 136 (1932), to whom an underlying duty of fair treatment is owed by the corporation or majority stockholders or controlling directors and officers thereof. While it may be said that the Indenture itself is a contract, *Kaplan v. Vorna-*

*do, Inc.*, 341 F.Supp. 212 (N.D.Ill.1971); *Buchman v. American Foam Rubber Corp.*, 250 F.Supp. 60 (S.D.N.Y.1965), it was clearly entered into with listing on the NYSE in mind and was substantially simultaneous in execution and coordinate in operation with the listing application. On this basis it would be unnecessary in the writer's view to reach the ground upon which the court relies, but since this view is individual only, he joins in the ground for decision taken.

the debentures themselves in order to find out what notice would be provided in the event of redemption.

Boeing could very easily have run more than two advertisements in a single paper prior to the eleventh hour (March 28), at which time it issued its belated news release and advertised for the third time in the Wall Street Journal and for the first time in the New York Times. Moreover, in the same period that the debentures were in the process of being redeemed, Boeing was preparing for its annual meeting (to be held April 24). Proxy materials were being prepared throughout March and were finally mailed sometime between March 24 and March 30. Management could readily have arranged the redemption dates and the proxy mailing so that notice of the redemption dates could have been included in the envelope with the proxy materials. Thus at no extra cost except that of printing brief notices, at least all Boeing shareholders would have received mail notice, and presumably a significant number of the plaintiff class owned Boeing common stock, as well as debentures, in 1966. Had Boeing attempted such mail notice, or mail notice to original subscribers, and also given further newspaper publicity either by appropriate news releases or advertising earlier in the redemption period, we would have a different case and reasonable and sufficient notice might well be found.

Nothing that we have said is inconsistent with either *Abramson v. Burroughs Corp., supra,* or with *Kaplan v. Vornado, Inc., supra.* These cases are distinguishable on their facts as well as in respect to the legal arguments made.

In *Abramson* the court was presented with the claim that Rule 10b–5 was violated in connection with the sale of certain convertible debentures. As here, a nonconverting debenture holder was suing for the amounts lost when he failed to convert before the expiration of the conversion period and he challenged the notice procedures in connection with the redemption. In *Abramson,* however, the principal contention was that there were material omissions in the *prospectus* issued in connection with the sale of the debentures. Abramson alleged that the notice provisions in the prospectus were misleading in that they omitted the nature and frequency of notice that bondholders would receive.

Judge Lumbard in *Abramson* found quite to the contrary that the face of the debentures—unlike those here—stated exactly what notice would be provided, notice which incidentally was at least twice that required here, making specific reference to publication once a week for four weeks in a newspaper of general circulation in New York and one in Detroit. Thus the Burroughs debentures in *Abramson* specifically informed the investor where and how often notice of redemption would be published so that he could make a reasonable evaluation of the likelihood that he would receive such notice or take steps to increase the chances that he would see it either by subscribing to the Wall Street Journal or the like, by contacting a broker to handle the matter for him, or by registration.[20]

The notice provisions in *Abramson* were minimal but sufficient to clear judicial approval; the notice here was significantly less. Moreover, the Boeing debentures themselves were somewhat misleading. While they indicated that redemption could be made on not less than 30 days' notice, one would have had to have been, if not a lawyer, at least an experienced and knowledgeable investor, to read the fine print two paragraphs previously which said that the conversion

---

20. In *Abramson,* moreover, the court emphasized that the debentures in issue specifically stated on their face that the bonds could be registered, and if registered that notice of a call would be provided to registered holders by mail. The court therefore concluded that the nonconverting debenture holders had themselves to blame for not receiving notice. Here, there was no such explicit information on the Boeing debentures. While the debentures did state that they could be registered, as we have said, there was no indication that registration would protect the investor by providing him with notice by mail.

right ran only "to and including but not after the tenth day prior to the redemption date. . . ."

In *Kaplan v. Vornado, Inc., supra,* where the percentage of nonredeeming debenture holders was under 3 per cent as opposed to the 7 per cent here, in addition to notices published in the New York Times in accordance with the indenture agreement there was a press release *prior* thereto which resulted in publications of the announcement of redemption in the Wall Street Journal, Women's Wear Daily, Daily News Record, Homes Furnishing Daily, and on the Reuters and Dow-Jones wire services. The court in *Kaplan* specifically found that "the essential facts of the defendant's redemption and of the termination of the holders' conversion rights were printed in these news items." 341 F.Supp. at 213.[21]

What one buys when purchasing a convertible debenture in addition to the debt obligation of the company incurred thereby is principally the expectation that the stock will increase sufficiently in value that the conversion right will make the debenture worth more than the debt. The debenture holder relies on the opportunity to make a proper conversion on due notice. Any loss occurring to him from failure to convert, as here, is not from a risk inherent in his investment but rather from unsatisfactory notification procedures. *See* Note, 54 Cornell L.Rev. at 271. *See also* Miller, *How to Call Your Convertibles,* Harv.Bus.Rev. 66, May/June 1971.[22] The

debenture holder's expectancy is that he will receive reasonable notice and it is his reliance on this expectancy that the courts will protect. *See generally* Fuller & Perdue, *The Reliance Interest in Contract Damages,* 46 Yale L.J. 52, 373 (1936–37). *See, e. g., Associated Perfumers, Inc. v. Andelman,* 316 Mass. 176, 55 N.E.2d 209 (1944). *See also Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Had there been proper publication, a reasonable investor undoubtedly would have taken action to prevent the loss occurring to him.

Of course, it may be suggested that the appellee corporation itself was not the beneficiary of the appellants' loss; rather, the corporate stockholders benefited by not having their stock watered down by the number of shares necessary to convert appellants' debentures. But an award against Boeing will in effect tend to reduce *pro tanto* the equity of shareholders in the corporation and thus to a large extent those who were benefited, one might almost say unjustly enriched, will be the ones who pay appellants' loss.[23]

On the foregoing basis it is unnecessary for us to determine whether there is any cause of action under the Trust Indenture Act, 15 U.S.C. § 77bbb, as appellants contend. Nor, because appellants would not have standing to assert it, do we ground liability upon or make reference in the context of liability to appellants' argument that the call was

---

**21.** The writer would note that in *Kaplan* the company did indeed comply with the NYSE Listing Agreement-Company Manual requirement of a general news release at the start of the redemption.

**22.** Obviously, where a conversion is not made there may be costs to the company itself which unnecessarily has to make redemption payouts. Miller, Harv.Bus.Rev. at 67. Miller goes on to say that "newspapers have *not* proved an effective conduit, and because of this the corporate officer must concentrate on the mailing approach." Perhaps one solution to the overall problem would be the English one, whereby the convertible debenture is considered converted once the total principal

amount of the issue outstanding is less than 25 per cent of its original size. *Id.* at 70.

**23.** On the remand for a determination of damages, it might be appropriate for the district court to allow Boeing to meet the liability resulting from this case by issuing stock. That is what the plaintiffs would have had if they had received notice of the redemption call, and one of the purposes of the redemption was to enable the company to exchange debt for equity capital. It would thus seem appropriate for Boeing to be able to issue stock to meet all or part of this liability, with, of course, the shares being valued according to their market value at date of issuance.

illegal in the first instance because it was based upon an improper conversion rate.

## DAMAGES AND THE "CONVERSION RATE"

We must, however, in remanding to the district court for a determination of damages, take note of the conversion rate argument which was rejected by the court below. That argument was essentially that the 4 per cent stock dividend declared in November, 1958, the 2 per cent stock dividend declared in November, 1959, and the acquisition by Boeing on March 31, 1960, of substantially all the assets of Vertol Aircraft Corp. necessitated an adjustment in the conversion rate of two shares of Boeing stock for each $100 of debentures in accordance with Section 4.05 of the Indenture.[24] At all times after these three transactions, Boeing treated the conversion rate as 2.0448. Because that rate was under 2.045, no adjustment was required under the Indenture § 4.05(f), which provided in part that

> Whenever the amount by which the conversion rate would be changed in accordance with the foregoing provisions of this Section 4.05 is less than one-twentieth of a share of Capital Stock the Company at its option need not make such adjustment at that time.

Appellants on the other hand contend that the proper conversion rate was at least 2.045 or as high as 2.08.

On November 4, 1958, Boeing declared a 4 per cent stock dividend and issued 281,537 shares therefor. Section 4.05(b)iv states that in the case of shares so issued the consideration therefor shall be "deemed to be the number of shares so issued multiplied by the market value thereof."[25] Boeing initially calculated the market value by including the stock dividend shares in the number of shares outstanding to obtain the market value of the post dividend stock, i. e., by dividing the closing price of the stock on November 4 of $56.875 by 1.04 since there were 104 shares where there had been 100. This resulted in a market value figure rounded off to $54.75 which, multiplied by the number of stock dividend shares issued, gave a total consideration therefor of $15,414,151.[26] On this basis the calculated rate was 1.9927 but since the indenture required that the conversion rate not be below 2.00, note 26 supra, the rate remained at 2.00. Appellants agree that the rate should be 2.00 but contend that the consideration for the stock dividend shares should be treated as at $14,076,850, the figure which would result from a flat 2.00 or $50 per share rate (above which stock dividend shares could not be valued under the limitations of Section 4.05(a), note 26 supra).

Initially the 2 per cent stock dividend of 147,489 shares on November 2, 1959, was treated by Boeing in the same way as the previous year's dividend. The November 2, 1959, closing price of $30.375

---

24. The section is four printed pages long and therefore will not be reprinted here in its entirety.

25. Market value in connection with a limited stock dividend is defined in Section 1.01 as follows:

> For the purposes of this definition market value shall mean the last reported sale price of the Capital Stock of the New York Stock Exchange (or if not listed on the New York Stock Exchange, then on any national securities exchange where listed) on the date of declaration of each stock dividend involved or, if there shall not have been a sale on such date, on the basis of the average of the bid and asked quotations therefor on said exchange on such date, or if the Capital Stock shall not then be listed on any nation-

al securities exchange, on the basis of the average of the bid and asked quotations in the over-the-counter market on such date.

26. That consideration and the number of shares issued were to be added to the initial consideration of $351,872,350 and 7,037,447 (valued at $50 per share) shares. Under the basic conversion rate formula the product of $100 and the number of resulting shares is divided by the aggregate consideration. The resulting quotient, adjusted to the nearest one-hundredth, shall thereafter be the conversion rate (until further adjusted) if it is greater than the basic conversion rate [of 2.00 shares for each $100 debenture]." Sec. 4.05(a). But if the adjusted rate is less than 2.00 the basic conversion rate of 2.00 governs.

per share was divided by 1.02 to obtain a quotient of $29.77 which, multiplied by the number of shares (147,489), gave additional consideration of $4,390,748 to be added to the aggregate consideration (under Section 4.05(b)) [27] after the prior stock dividend.

The gist of appellants' complaint about the conversion rate is that in connection with the acquisition of Vertol Aircraft assets in 1960 for 472,736 shares of Boeing, not only were the Vertol assets overevaluated and evaluated at the wrong time so as to obtain the highest evaluation, but the prior stock dividend adjustments were recomputed to the debenture holders' disadvantage. The argument is that all this was done having the conversion rate precisely in mind and with the purpose of keeping it at 2.044999 or below so as to avoid adjustment. (See Exhibit 28.)

The recomputation of the stock dividend adjustments was as follows. The full share price of $56.875 at the close of the 1958 dividend day was taken, that is, the stock dividend shares were not included in the number of shares outstanding. Thus the consideration received was calculated at $16,012,417 (281,537 x 56.875) rather than the $15,414,151 previously used. The same was done in connection with the 1959 2 per cent stock dividend, resulting in increased consideration of $4,479,979 rather than the $4,390,748 previously used. Appellants urge that Boeing thereby "added" consideration received of $1,935,567 from the 1958 dividend (because appellants would treat that as $14,075,850) and $87,843 from the 1959 dividend, thus leaving at the end of this recomputation a conversion rate of 2.0052 rather than one of 2.0161. But the lower court found, and we agree, that while appellants' computations, or at least Boeing's original ones, better represent the economic realities and more accurately follow general accounting practice, there was discretion in the Board under Section 1.01, note 25 *supra*, not to include the dividend shares in computing the market value.

In connection with the Vertol acquisition, the value placed on it for purposes of determination of the conversion rate was the market value of the Boeing stock on November 13, 1959, at 33⅝, for a total of $15,895,748. Appellants argue that three different valuations would have been more accurate and fairer: the valuation on March 31, 1960, of the Vertol assets as recorded on the Boeing books at $12,435,138.47; that on January 18, 1960, when the contract of acquisition was signed and the Boeing stock worth 30⅝; or that on March 30, 1960, when the contract was closed and the Boeing stock worth 24⅛. Any one of these valuation measures would have increased the conversion ratio to over 2.045. But Section 4.05(b)(2) of the Indenture provided that "in the case of the issuance of shares for consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair value thereof as determined by the board of directors." The district court's finding was that there was no evidence that Boeing "had any purpose of deliberately hurting its debenture holders" and that while it was true that on November 13, 1959, the acquisition was still tentative, the board of directors had a colorable right to fix the fair value of the consideration as of November 13, 1959. That decision was one made, the court below found, in good faith and with the approval of accountants, auditors, investment bankers and counsel. Consequently, the court found that the decision was not subject to attack. *See Morris v. Standard Gas & Electric Co.*, 31 Del.Ch. 20, 63 A.2d 577 (1949). We do not believe the trial court's findings clearly erroneous. On those findings the conclusion of law was correct. In short, we affirm so much of the trial court's opinion as relates to the conversion rate.

Judgment affirmed in part; reversed and remanded in part.

27. Appellants overlook the aggregate aspect of Section 4.05(b).