Louise SIMONS, Plaintiff,

v.

Marshall S. COGAN, Stephen D. Weinroth, Hansac, Inc. and Knoll International Holding, Inc., formerly known GFI/Knoll International Holding Company, Knoll International, Inc., Defendants.

Civ. A. No. 8890.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 9, 1987.
Decided: Dec. 2, 1987.

Robert Goldberg of Biggs and Battaglia, Wilmington, and Mitchell A. Kramer, Steven M. Steingard and Larry M. Keller of Mitchell A. Kramer & Associates, Philadelphia, Pa., of counsel, for plaintiff.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, and Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., of Counsel, for defendants.

## OPINION

ALLEN, Chancellor.

It has now become firmly fixed in our law that among the duties owed by directors of a Delaware corporation to holders of that corporations' debt instruments, there is no duty of the broad and exacting nature characterized as a fiduciary duty.[1] Unlike shareholders, to whom such duties are owed, holders of debt may turn to documents that exhaustively detail the rights and obligations of the issuer, the trustee under the debt indenture, and of the holders of the securities.

Such documents are typically carefully negotiated at arms-length. In a public offering, the underwriter of the debt, and to some extent the indenture trustee, have an interest in negotiating in that fashion; in a private placement, the purchaser has a similar interest. More importantly, the purchaser of such debt is offered, and voluntarily accepts, a security whose myriad terms are highly specified. Broad and abstract requirements of a "fiduciary" character ordinarily can be expected to have little or no constructive role to play in the governance of such a negotiated, commercial relationship.

Accordingly, it is elementary that rights of bondholders are ordinarily fixed

1. That was the clear implication of *Wolfensohn v. Madison Fund, Inc.,* Del.Supr., 253 A.2d 72 (1969); *Harff v. Kerkorian,* Del.Ch., 324 A.2d 215 (1974), *aff'd in part and rev'd in part,* Del. Supr., 347 A.2d 133 (1975) and *Mann v. Oppenheimer & Co.,* Del.Supr., 517 A.2d 1056, 1063 (1986); and was the holding of our unreported opinions in *Norte & Co. v. Manor Healthcare Corp.,* Del.Ch., C.A. No. 6827 and 6831, Berger, V.C. (November 21, 1985) and *Continental Illi-* nois *Nat'l Bank and Trust Co. v. Hunt Int'l Resources Corp.,* Del.Ch., C.A. Nos. 7888 and 7844, Jacobs, V.C. (Feb. 27, 1987). In a series of cases this court and the Delaware Supreme Court has expressed this in *dicta. See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 182 (1986); *Katz v. Oak Industries, Inc.,* Del.Ch., 508 A.2d 873 (1986); *Kass v. Eastern Airlines, Inc.,* Del.Ch., Allen, C., C.A. No. 8700 (November 14, 1986);

by and determinable from the language of documents that create and regulate the security. In a publicly distributed debenture the notes themselves and a trust indenture serve this function, but other documents such as a note agreement or, in the case of secured bonds, security agreements may be involved. Of course, in some circumstances bondholders may have rights against an issuer that are not expressly created by the indenture or other original documents. Most palpably this is the case where a statute has been violated or when bondholders allege and prove fraud in the inducement of the purchase of the bonds. In addition, the contractual documents creating the debenture and the duties of the issuer may, in narrow circumstances, be held to imply obligations arising from an implied covenant of good faith and fair dealing. *See, e.g., Katz v. Oak Industries, Inc.*, Del.Ch., 508 A.2d 873, 878–80 (1986), note 7 (1986); *Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1383 (2d Cir.1975) (applying New York law).

This case is a purported class action brought on behalf of the holders of 8⅛% Convertible Subordinated Debentures of Knoll International, Inc. The complaint seeks various relief against the issuer of these bonds, and, among others, its controlling shareholder. Central to the theories of recovery urged is the contention that the defendants, in the particular circumstances presented, do owe a fiduciary duty to the bondholders [2] and have breached that duty. In addition, as amplified at oral argument, plaintiffs' position is that the facts alleged also state a claim for fraud, and for breach of contract, including a breach of an implied contractual duty of good faith.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief may be granted. For the reasons set forth below, I conclude that, assuming the well-pleaded factual allegations of the complaint to be true, those facts do not state a legal wrong to the class of bondholders. The pending motion will therefore be granted.

## I.

The debentures here involved were issued in 1983 pursuant to a public offering and had an original maturity of twenty years. As issued, they were convertible at the option of the holder into the Company's Class A Common Stock at a rate of one share for each $19.20 principal amount of debentures and were redeemable, at the Company's option, after August 15, 1985, at a stated premium which decreased as the securities matured. The bonds were subordinated and bore interest at 8⅛%.

The issuer of these convertible debentures, Knoll International, Inc. ("Knoll"), is controlled through a series of subsidiaries by defendant Knoll International Holdings, Inc., which, in turn, is controlled by defendant Marshall S. Cogan. The gist of the complaint is that defendants caused the minority shareholders of Knoll to be eliminated through a two-stage transaction involving a $12 cash tender offer followed by a cash for stock merger at the same price. The merger that culminated this process occurred on January 22, 1987 and left Knoll, the issuer, as the surviving corporation and a wholly-owned subsidiary (indirectly) of Holdings. In connection with that merger, a Supplemental Indenture was executed by the issuer and the indenture trustee providing that, instead of each $19.20 of principal amount of the debentures being convertible into one share of Knoll Class A Common Stock, such principal amount would henceforth be convertible into the consideration received by the public Class A shareholders in the merger —$12 cash. The core complaint is that the substitution of a right to convert to $12 in lieu of a right to convert to Class A Common Stock is unfair and a wrong.[3]

---

**2.** For purposes of this opinion, I use the term "bonds" and "debentures" interchangeably, overlooking for the moment their technical differences relating to whether or not the note is secured.

**3.** Knoll's Class A common was trading at 9¼ on the day before announcement of the $12 cashout transaction; the 8⅛% debentures were trading at 86 at that time. Complaint ¶ 15(g). The debentures, however, allegedly declined in value upon announcement of the supplemental inden-

The complaint states that the issuer owes a fiduciary duty to the holders of its convertible debentures and asserts a lengthy list of facts that are said to constitute violations of that duty. For example, it is said that the the self-dealing merger transaction was effected at a particularly disadvantageous time from the point of view of the minority stockholders; it was not negotiated by an independent committee; and the offering circular in connection with the tender offer leg of the transaction contained false and misleading information. Twelve dollars per share is said to be an unfairly low price, and inadequate consideration for loss of a Class A share; the right to convert to $12, thus, is seen as an inadequate substitute for the right to convert into a Class A share.

It is concluded (¶ 17) that, "the defendants have ignored and breached the fiduciary duty of fair dealing they owe Knoll's debenture holders in structuring and proposing the Merger."

While it is not the principal theory of the complaint, a breach of contract theory can be detected in that pleading. See Complaint ¶¶ 13, 15(b), 15(j). Paragraph 13 asserts that the First Supplemental Indenture—which changed the conversion right from Class A Common Stock to cash—was entered "without the consent of the debenture holders as provided in § 15.02 of the original Indenture." At oral argument a somewhat different breach of contract theory—breach of a contractual obligation of good faith—was alluded to.

Finally, it is also asserted that the complaint states a claim of common law fraud. Various assertions of inadequate disclosure in the tender offer document and in the 1983 prospectus published in connection with the original distribution of the debentures, are urged in support of this theory, although a reading of the complaint makes it utterly clear that, when drafted, those allegations were intended not to make out a claim of fraud but to bolster plaintiffs' principal, roll-it-all-into-a-ball, theory of breach of a fiduciary duty of entire fairness.

The complaint seeks, among other relief, rescission of the merger or the establishment of a new conversion rate and damages.

## II.

■ I turn first to an evaluation of plaintiff's principal contention—that defendants owe to him as a holder of convertible debentures a fiduciary duty of loyalty and fairness. The answer to that central contention begins with a recognition that the courts of this state have consistently recognized that neither an issuer of debentures nor a controlling shareholder owes to holders of the company's debt securities duties of the special sort characterized as fiduciary in character. See cases cited at note 1. Those cases establish in this jurisdiction "that (i) a debenture holder has no independent right to maintain a claim for breach of fiduciary duty, and (ii) in the absence of fraud, insolvency or a statutory violation, a debenture holder's rights are defined by the terms of the indenture." *Continental Illinois National Bank and Trust Company v. Hunt International Resources Corp.*, C.A. No. 7888, Jacobs, V.C. (February 27, 1987). In so holding, of course, our cases are directed to claims against an issuer not to those directed against an indenture trustee.[4]

Under this traditional approach, it has no particular significance that the debentures in question are convertible into stock at the option of the holder. As early as 1889 Justice Holmes noted that such a conversion right is:

... simply an option to take stock as it may turn out to be when the time for choice arrives. The bondholder does not

---

ture, trading at 73¼ immediately thereafter. Complaint ¶ 16(d).

**4.** The latter question is quite different and, in many respects, more complex, involving the interaction of state fiduciary duty law and the federal Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa–bbbb (1970). *See Dabney v. Chase National Bank,* 196 F.2d 668 (2d Cir.1952). *See generally* Campbell and Zach, *Put a Bullet in the Poor Beast,* 32 Bus.Law 1705 (1977).

become a stockholder by his contract, in equity any more than at law ...

*Parkinson v. West End Street Railway Co.*, Mass.Supr., 53 N.E. 891 (1899). *See also Lisman v. Milwaukee, L.S. & W. Ry. Co.*, 161 F. 472 (E.D.Wisc.1908) *aff'd* 170 F. 1020 (7th Cir.1909). This court made the same observation in *Harff v. Kerkorian*, Del.Ch., 324 A.2d at 219 in concluding that holders of a corporation's convertible debt were not stockholders in equity entitled to act as corporate representatives in derivative litigation. The implication of *Harff* was, of course, that, as creditors, holders of such debt were not the beneficiaries of fiduciary duties.

In so holding, the courts of this state have announced and applied well-established, conventional legal doctrine:

> Courts traditionally have directed bondholders to protect themselves against ... self-interested issuer action with explicit contractual provisions. Holders of senior securities, such as bonds, are outside the legal model of the firm for protective purposes: a heavy black-letter line bars the extension of corporate fiduciary protections to them.

Bratton, *The Economics and Jurisprudence of Convertible Bonds*, 1984 Wisc.L. Rev. 667, 668 (1984). *See also* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* (1971) at 527 (hereafter "ABF *Commentaries*").

This traditional view, which continues to be applied in in other jurisdictions as well as in Delaware [5] has not gone altogether unchallenged in the modern cases. In *Broad v. Rockwell International Corp.*[6], a panel of the Fifth Circuit Court of Appeals held that an issuer of convertible debentures does owe a duty of fidelity to holders of such securities, although at its critical point, the doctrinal analysis of that point fails rather completely. *See* 614 F.2d at 430–31.[7] In all events, on *en banc* review, that opinion was vacated and, while the full court assumed for purposes of its decision the existence of such a duty, *see* 642 F.2d 929 at 958, one cannot fairly read the later opinion except as an endorsement of the traditional conceptualization of the basis for the legal relationship between an issuer of convertible bonds and the holders of such securities.[8] In *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.1975), the Second Circuit Court of Appeals, applying New York law, found a covenant of good faith and fair dealing implied in a convertible debenture indenture. Judge Oaks alone on that panel indicated a willingness to go further and find an "underlying duty of fair treatment ... owed by the corporation or majority stockholders or controlling directors and officers" to bondholders. 520 F.2d at 1385. But another panel of that court, in a later phase of that same case has made clear that the rationale for the result reached in *Van Gemert* was contrac-

---

5. *See, e.g. Kessler v. General Cable Corporation*, 92 Cal.App.3d 531, 155 Cal.Rptr. 94 (1979). *Cf. In Re Will of Migel*, 71 Misc.2d 640, 336 N.Y.S.2d 376, 379 (1972).

6. 614 F.2d 418 (5th Cir.1980) ["Broad I"] *vacated*, 642 F.2d 929 (5th Cir.1980) (*en banc*) ["Broad II"] *cert. denied* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

7. Reliance by the panel in *Broad I* on identical *dicta* of Justice Douglas in two cases (*Pepper v. Litton*, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939) and *Superintendent of Insurance v. Banker's Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971)) surely provides too frail a support for the conclusion reached. I need not now dilate upon those cases (although they are cited by plaintiff here) except to say that they were actions brought by a trustee in bankruptcy (not credi-

tors) *on behalf of* a bankrupt *corporation* against a controlling shareholder for breach of fiduciary duty. They were properly maintained under perfectly conventional principles of fiduciary duty and legitimately raise no question about the existence of such a duty towards creditors. *Pepper* acknowledges as much. *See* 308 U.S. at 307, 60 S.Ct. at 245.

8. For example, the court *en banc*, in rejecting the argument that Rule 10b–5 had been violated by a merger which had the legal effect of eliminating the legal existence of the issuer and, thus, eliminating the value of the conversion feature of outstanding convertible debentures said that plaintiffs had "received ... all to which they were contractually entitled under the Indenture ... As a conceptual matter [defendants] could not have fraudulently schemed to deprive the holders of Debentures of a right that those holders did not in fact have." 642 F.2d at 963.

tual, not fiduciary. *See* 553 F.2d 812 (2d Cir.1977).

And in *Pittsburgh Terminal Corp. v. Baltimore & O.R. Co.*, 680 F.2d 933 (3d Cir.1982), Judge Gibbons of the Third Circuit Court of Appeals noted, without citation of authority or elaboration, that he "would be very much surprised if Maryland or any other state would today hold that no [fiduciary] obligations were owed by an issuer of [convertible] securities and its directors." 680 F.2d at 941. The two other members of that panel, however, specifically disavowed any such conclusion. *See* 680 F.2d at 943 (Garth, J. concurring); 680 F.2d at 954 (Adams, J. dissenting).

Finally, in a case relied upon by plaintiff here, the United States District Court for the Southern District of New York purported to find in our Supreme Court's reversal in part of this court's opinion in *Harff v. Kerkorian* authority for the imposition of fiduciary obligations running from the issuer and its directors to holders of convertible securities. *See Green v. Hamilton*, S.D.N.Y., 76 Civ. 5433 (July 13, 1981).

Thus, there exists a body of judicial opinion willing to extend the protection offered by the fiduciary concept to the relationship between an issuer and the holders of its convertible debt securities. These seeds, however, have fallen upon stones. None of the appellate opinions actually represent a holding so extending that concept and, indeed, each of those cases evidence the fact that prevailing judicial opinion remains to the contrary.

In relying upon the district court opinion in *Green*, plaintiff invites this court to reinterpret the reading of *Harff v. Kerkorian* that it made in *Norte & Co. v. Manor Healthcare Corp.*, Del.Ch., C.A. No. 6827, Berger, V.C. (November 21, 1985). In *Harff*, this court dismissed a complaint holding (1) that the holder of a convertible debenture was not a stockholder in equity and, thus, had no standing to bring a derivative action on behalf of the issuer and (2) that plaintiff had not alleged any direct claim based upon fraud. Our Supreme Court reversed the judgment of the Chancellor on the latter point but summarily affirmed without discussion his holding on the dismissal of the derivative claim. *See* 347 A.2d at 134. In *Green* the district court construed the effect of the Supreme Court reversal as permitting a conclusion that fiduciary duties to convertible debenture holders may exist. It then held that:

> "if wrongs alleged impinged upon the equity aspects [of convertible debt], then the analysis would more properly treat plaintiffs like shareholders to whom the majority shareholders and directors of the corporation owe a duty of "honest, loyalty, good faith and fairness."

Slip opinion, text at n. 14.

The flaws in the *Green* analysis are two. First, and most simplistically, that case simply misreads, in my opinion, the clear implication of the Supreme Court opinion in *Harff*. *See Norte & Co. v. Manor Healthcare Corp.*, Del.Ch., C.A. No. 6827, Berger, V.C. (November 21, 1985) in which this court reviewed that matter and concluded differently than did the *Green* court.[9] Second, and more substantively, the analysis of the *Green* opinion is not persuasive when viewed independently. That a convertibility feature of a debt security creates an economic interest in the issuers stock price that the holder of a straight debt instrument would not have is plain. But, it does not follow at all that from such additional economic interest, fiduciary duties of loyalty, etc. necessarily or properly flow. Such duties and the restriction on self-dealing, etc. that they entail have been imposed upon those to whom property has been entrusted to manage for the benefit of another. Trusts are the prototype, but the concept has long been extended to corporate officers and directors, agents, partners, etc. *See McMahon v. New Castle Associates*, Del.Ch., 532 A.2d 601 (1987). But it has not been extended to negotiated commercial transactions where the original property owner transfers it with a contrac-

---

**9.** Subsequently to the issuance of the *Norte & Co.* opinion the Supreme court, while not discussing the point, has had occasion to cite the Chancery opinion in *Harff v. Kerkorian*. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 182 (1986).

tual right to repayment. Thus, for example, no case holds that the relationship between a bank and its borrower involves a fiduciary duty running from the borrower; nor, indeed, in the case of a deposit relationship from the bank to its depositor.

While the convertibility feature of convertible bonds creates an economic interest in an issuers stock price, so long as the right to convert is not exercised, it remains merely an option, and the holder of it retains all of the benefits of his creditor status. Until the moment of exercise, his investment is not held subject to the risks that the fiduciary duty concept was designed to address, but is held pursuant to a negotiated contract detailing rights and duties and conferring upon the creditor a legal right to repayment. Thus, what Justice Holmes said in 1899 in *Parkinson v. West End Street Railway* remains true; the holder of a convertible bond is and only is a corporate creditor to whom contractual but not fiduciary duties are owed unless he acts to end his entitlement to the legal protections his contract affords him and to assume the risks of stockholder status through exercise of the power of conversion.

Accordingly, were I free to pass upon the question presented in *Harff* and *Norte & Co.* for the first time, I could find nothing in *Green* or in the other federal opinions cited above to suggest that an alteration in the traditional structure governing the legal relationship between corporations and holders of their convertible debt is warranted. That traditional approach has not been shown to be inadequate in any important way. Underwriters of convertible securities do have an interest in negotiating protections on points regarded as material by ultimate purchasers of those securities. The development of elaborate anti-destruction and anti-dilution provisions in indentures attests to the relative effectiveness of this mechanism of defining rights and obligations of issuers. *See* ABF *Commentaries* at 290–301.

The tide has no doubt long run away from a world of hard and fast rules with predictable outcomes and towards a world in which it is common for courts to evaluate specific behavior in the light cast by broadly worded principles.[10] Working amid such flows, however, courts must be wary of the danger to useful structures that they entail. To introduce the powerful abstraction of "fiduciary duty" into the highly negotiated and exhaustively documented commercial relationship between an issuer of convertible securities and the holders of such securities would, or so it now appears to me, risk greater insecurity and uncertainty than could be justified by the occasional increment in fairness that might be hoped for. *See generally* Bratton, *The Economics and Jurisprudence of Convertible Bonds, supra,* at 730–739. I conclude that plaintiff has failed to state a claim of breach of fiduciary duty upon which relief may be granted.

### III.

At oral argument plaintiff asserted that the facts alleged constituted a fraud. The elements of such a claim have been variously stated, but it is generally acknowledged that in order to allege fraud, it is necessary to allege that defendant, (1) with an intent to deceive, made a (2) false statement of a (3) material fact upon which plaintiff (4) reasonably (5) relied to his (6) detriment. *Harman v. Masoneilan International, Inc.,* Del.Supr., 442 A.2d 487 (1982); *Twin Coach Co. v. Chance Vought Aircraft, Inc.,* Del.Super., 163 A.2d 278 (1960); *see also* Prosser and Keeton *Law of Torts* at 728 (5th ed.).

The alleged false statements (or omissions) in this instance are said to arise from (1) the Offering Circular distributed in connection with the tender offer (Complaint ¶ 15(i)(A)–(C)) and, somehow, from (2) the 1983 prospectus issued in connection

10. Professor P.S. Atiyah has brilliantly captured the zeitgeist in his inaugural lecture at Oxford University, which has been reprinted by the Iowa Law Review. *See* Atiyah, *From Principles to Pragmatism: Changes in the Function of the Judicial Process and the Law,* 65 Iowa L.Rev. 1249 (1980).

with original distribution of the debentures (Complaint ¶ 15(j)).

Neither aspect pleads the elements of a claim of common law fraud. As to the Offering Statement, it is enough to note that it was not distributed to bondholders nor did it call for or invite any action by bondholders. No identified (or even conclusory) reliance upon it by bondholders is in fact alleged. Therefore, I need not address the adequacy of the pleadings with respect to several of the other necessary elements of the tort. Concerning the assertion that the 1983 prospectus somehow renders the merger fraudulent as to the bondholders, the allegation is that: "The [two-step cash-out transaction] was not structured or implemented with the requisite entire fairness for ... the following reasons ... (j) the prospectus for the Debentures dated August 9, 1983 was false ... because ... it did not disclose that the consent of the Debenture holders to a modification of the Indenture to accomplish an adjustment which adversely affected conversion rights ... would not be sought ...". (¶ 15(j)). Assuming this allegation to be true, it fails to allege essential elements of the tort of fraud. Most notably, it contains no allegation of *scienter*, an essential element of this common-law action. *Harman v. Masoneilan International, Inc.*, Del.Supr., 442 A.2d 487, 499 (1982). Accordingly, I conclude that the complaint does not plead facts which, if true, would constitute the tort of fraud.

### IV.

■ Having determined that the complaint states no claim for breach of fiduciary duty or common-law fraud, we are left with possible claims for breach of contract. But, before turning to those claims, there is a consequence of the determinations already reached that should be noted. Article 13 of the Indenture is a rather standard[11] "no recourse" provision providing broadly that liability for breach of any obligation created by the indenture shall not attach to any stockholder, officer or director of the issuer, but such liability shall be limited to the corporation itself.[12] Such provisions are customarily respected by courts, *see* W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1333 at 754, § 6422 at 436 and § 9121 at 732–738 (Perm. ed.) and have been recognized as valid by this court. *See Harff v. Kerkorian, supra* 324 A.2d at 217; *Continental Illinois National Bank and Trust Co. v. Hunt Int'l Resources Corp., supra,* slip. op. at 13–14.

Accordingly, Article 13 precludes recovery on a breach of contract theory from all defendants other than the issuer, Knoll International, Inc. Thus, the complaint having failed to state against such defendants any non-contractual claim upon which relief may be granted, the pending motion to dismiss as to them shall be granted.

### V.

■ I turn then to an evaluation of plaintiff's breach contract theories. The core complaint is that the issuer breached its obligations under the indenture by executing a supplemental indenture on January 22, 1987. That supplemental indenture had the principal effect, or purported effect, of substituting a $12 cash conversion right for

---

11. *See The Model Simplified Indenture,* 38 Bus. Law. 741, 778 (Feb. 1983).

12. Article 13 provides in pertinent part as follows:

No recourse shall be had for the payment of the principal of, premium, if any, or the interest on any Debentures, or any part thereof, or for any claim based thereon or otherwise in respect thereof, or of the indebtedness represented thereby, or upon any obligation, covenant or agreement of this Indenture, against any incorporator, or against any stockholder, officer or director, as such, past, present or future, of the Company, or of any predecessor or successor corporation, either directly or through the Company or any such predecessor or successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that this Indenture and all the Debentures are solely corporate obligations, and that no personal liability whatsoever shall attach to, or be incurred by, any such incorporator, stockholder, officer or director, past, present or future, of the Company ...

the right to convert to Class A Common Stock. Plaintiff asserts that (1) such amendment violated § 15.02 of the Amendment and (2) violated an implied covenant of good faith. These issues are, under the terms of the Indenture, governed by New York law.

On the merits I find these theories to be dubious [13] but need not address their merits as I conclude that § 8.08 precludes plaintiff from pressing these contractual claims.

That section provides as follows:

§ 8.08. *No holder of any Debenture shall have any right to institute any action,* suit or proceeding at law or in equity for the execution of any trust hereunder or for the appointment of a receiver or *for any other remedy hereunder, unless* [among other things, "the holders of 35% in principle amount of the Debentures ... shall have requested the Trustee ... to institute ... suit ...] ...; it being understood and intended that *no one or more of the holders of Debentures shall have any right in any manner whatsoever by his or their action to enforce any right hereunder, except in the manner herein provided,* and that every action, suit or proceeding at law or in equity shall be instituted, had and maintained *in the manner herein provided* and for the equal benefit of all holders of such outstanding Debentures (subject to the provisions of § 8.04) which shall be the subject of such action, suit or proceeding; *provided, however,* that nothing in this Indenture or in the Debentures contained shall affect or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, premium, if any, and interest on the Debentures to the respec-

tive holders of the Debentures at the respective due dates in such Debentures stated, or affect or impair the right of action, which is also absolute and unconditional, of such holders to enforce the payment thereof. (Emphasis added.)

Indenture provisions regulating the right of debenture holders to bring suit under the indenture are standard, *see* ABF, *Commentaries* at 233. They serve a salutary purpose and have been enforced by this court, *see Noble v. European Mortgage & Investment Corp.,* Del.Ch., 165 A. 157, 159 (1933); *Tietjen v. United Post Office Corp.,* Del.Ch., 167 A. 846 (1933); *Norte & Co. v. Manor Healthcare Corp., supra,* as well as New York courts. *See Relmar Holding Co. v. Paramount Publix Corp.,* 147 Misc. 824, 263 N.Y.S. 776 (Sup.Ct.1932); *Greene v. New York United Hotels, Inc.,* 236 App.Div. 647, 260 N.Y.S. 405 *aff'd* 261 N.Y. 698, 185 N.E. 798 (1933).

Here, the document creating the bundle of rights that plaintiff owns specifically provides that, among those rights, is no right, in these circumstances, to sue for breach of contract individually. The document creating this property defines, in Section 8.08, what steps that must be taken to assert breach of contract claims. The complaint clearly discloses that those steps were not followed in this instance and, therefore, no justiciable claim for violation of the indenture is presented.[14]

It is not an adequate response to this result that, as a practical matter, plaintiff may not be able to get the concurrence of 35% of the principal amount of debentures. That is speculation and, even if true, may mean only that fewer than the required number of debenture holders regard the substitution of a $12 cash conversion right

---

**13.** For example, a careful review of the language of § 15.02 shows that it protects from amendment the right to convert to Class A Common Stock as created in Article 6. But Article 6 itself contemplates a mandatory supplemental indenture in the event of any merger in which the Class A Common Stock is "changed" (specifically referring to "a change to the right to receive cash"). Clearly § 15.02 was not violated by the supplemental indenture. However, whether § 6.06(b) itself mandated a supplemental indenture in the circumstances of this partic-

ular merger—in which the Class A Common Stock was "re-issued" and continued to exist after the merger is another and more difficult question. It is, however, one I need not address.

**14.** Were a claim for fraud or breach of some other non-contractual duty alleged, this failure would not be fatal. *See Continental Illinois, supra; Reinhardt v. Interstate Telephone Co.,* 71 N.J.Eq. 70, 63 A. 1097 (1906).

for the Class A Common Stock conversion right as undesirable. That no doubt *is* a question reasonable persons might disagree about. The common stock conversion right provided a (theoretically) unlimited up-side potential; even though the stock was selling for only $9 or $10 a share, it could climb above the conversion price of $19.20 and thence upward. But the cash conversion right provides an economic value that the common stock conversion right did not; it sets a floor below which one's investment will not fall. A rational investor, particularly given the price of the common stock and the $12 value of the cash conversion right, may well prefer the safety of the new right. Because the trading price of the debentures fell when the merger and the supplemental indenture were announced, plaintiff says the market did not. That is as may be, but, if true, it does not establish that some holders may prefer not to litigate against the issuer on this point. In all events, the indenture calls for action by the holders of a substantial amount of bonds (35%) before the trustee may be required to bring a suit of this character or, should it fail after a procedurally correct demand, before a bondholder may step forward to advance the interests of the class.

For the foregoing reasons, defendants' motion to dismiss the complaint shall be granted. IT IS SO ORDERED.