**LASALLE NATIONAL BANK,**
as successor Indenture
Trustee, Plaintiff,

v.

Ronald O. **PERELMAN,** Mafco Holdings Inc., MacAndrews & Forbes Holdings, Inc., Andrews Group Incorporated, Four Star Holdings Corp., Mafco Guarantor Corp. f/k/a Marvel V Holdings Inc., Mafco Finance Corp. f/k/a Marvel IV Holdings Inc., William C. Bevins, Donald G. Drapkin, Irwin Engelman, Laurence Winoker, Glenn P. Dickes, Joram C. Salig, Howard F. Gordon, David L. Cook and Doe Defendants 1 through 100, Defendants.

No. CIV. A. 97–645 RRM.

United States District Court,
D. Delaware.

April 10, 2001.

Joanne B. Wills, Mindy Friedman, Cynthia A. Clark, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, DE, James E. Spiotto, Franklin H. Top III, Mark D. Rasmussen, Chapman and Cutler, Chicago, IL, for plaintiff.

Anthony W. Clark, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, Robert E. Zimet, Susan Saltzstein, William J. Sushon, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for defendants.

## OPINION

McKELVIE, District Judge.

This is a commercial case. In 1993 and 1994, Marvel Holdings Inc. ("Holdings"), Marvel (Parent) Holdings Inc. ("Parent") and Marvel III Holdings Inc. ("Marvel III") (collectively, the "Marvel Holding Companies") issued a series of notes secured by stock of their subsidiary, Marvel Entertainment Group, Inc. ("Marvel"). The directors of the Marvel Holding Companies used the $550 million in proceeds from the notes to pay dividends to their parent corporations. Less than three years later, on December 27, 1996, Marvel and the Marvel Holding Companies filed voluntary petitions for relief pursuant to chapter 11 of the United States Bankruptcy Code.

Plaintiff LaSalle National Bank is the successor indenture trustee for the notes that were issued by the Marvel Holding Companies. Defendants (the "Perelman Group") are officers and directors of the Marvel Holding Companies and their parent corporations.

On December 8, 1997, LaSalle filed a complaint alleging that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders when they used proceeds from the notes to pay dividends to the parent corporations. LaSalle further alleged that the parent corporations were unjustly enriched when they retained the dividends. LaSalle sought to collect amounts due on the notes.

On October 29, 1999, the Perelman Group moved for summary judgment on all counts. On December 3, 1999, the Perelman Group answered LaSalle's complaint and asserted five counterclaims against LaSalle for willful breach of contract, contribution and setoff. The court heard oral argument on December 20, 1999. On February 7, 2000, the court granted summary judgment in favor of the Perelman Group and dismissed all of LaSalle's claims.

On March 3, 2000, LaSalle moved for summary judgment that it had not breached any contract and that the setoff and contribution counterclaims were now moot

as a result of the court's February 7, 2000 grant of summary judgment. On March 17, 2000, the Perelman Group conceded that the setoff and contribution counterclaims were moot, opposed LaSalle's motion for summary judgment and cross-moved for summary judgment as to the breach of contract counterclaims. This is the court's decision on the motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the affidavits, documents and deposition transcripts submitted by the parties.

### A. The Parties

#### 1. Counterclaim Plaintiffs—The Perelman Group

The Perelman Group includes Mafco Holdings Inc. ("Mafco"), MacAndrews & Forbes Holdings Inc. ("MacAndrews"), Andrews Group Incorporated ("Andrews"), Four Star Holdings Corp. ("Four Star"), Mafco Guarantor Corp. and Mafco Finance Corp. (collectively, the "Parent Companies"), all of which are parent companies of the Marvel Holding Companies. The Parent Companies are Delaware corporations with their principal places of business in New York City.

The Perelman Group also includes Ronald O. Perelman, William C. Bevins, Jr., Donald G. Drapkin, Irwin Engelman, Laurence Winoker, Glenn P. Dickes, Joram C. Salig, Howard F. Gordon and David L. Cook, all of whom are officers and directors of the Parent Companies and the Marvel Holding Companies.

Perelman owns and controls a complex corporate hierarchy that includes the Parent Companies and the Marvel Holding Companies. Each corporation within the hierarchy owns 100% of the common stock of its immediate subsidiary. Perelman owns 100% of Mafco; Mafco owns 100% of MacAndrews; MacAndrews owns 100% of Andrews; Andrews owns 100% of Four Star; Four Star owns 100% of Marvel III;[1] Marvel III owns 100% of Parent; and Parent owns 100% of Holdings.

#### 2. Counterclaim Defendant—LaSalle National Bank

LaSalle is the successor indenture trustee for the notes that were issued by the Marvel Holding Companies. NationsBank of Georgia was the original indenture trustee. NationsBank was succeeded first by Bank of New York and thereafter by LaSalle. LaSalle is a national banking association with its principal place of business in Chicago, Illinois.

### B. Perelman's Acquisition of Marvel

Marvel has published comic books since 1939 and has developed more than 3,500 proprietary characters including Spider Man, the Incredible Hulk and the Fantastic Four. Marvel generates its revenues from publishing and advertising and licensing of its properties. At one point in the 1990s, Marvel was the largest creator and publisher of comic books in North America.

In December 1988, Perelman sought to acquire Marvel. To accomplish this goal, the board of directors of Andrews formed a new wholly-owned subsidiary, Parent.[2] Andrews made a $10 million initial capital contribution to Parent. On January 6, 1989, Perelman, through Parent, pur-

---

1. Four Star also owns 100% of the common stock of Mafco Guarantor and Mafco Guarantor owns 100% of the common stock of Mafco Finance.

2. Parent was formerly known as New Marvel Holdings Inc.

chased Marvel from New World Entertainment Ltd. for $82.5 million. Perelman, Bevins and Drapkin served on Marvel's board of directors and Perelman became the chairman of the board.

After the acquisition, Perelman indirectly owned all of the stock of Marvel. On July 22, 1991, Perelman, through Parent, sold 40% of the issued and outstanding stock of Marvel in an initial public offering. The 16.8 million shares of Marvel common stock were sold at $4.125 apiece. The net proceeds of $63.7 million from the offering were used to reduce Marvel's indebtedness by $26.5 million and to pay a cash dividend of $37.2 million to Parent. After the public offering, Perelman retained ownership and control of 60% of the common stock of Marvel.

Less than one year after the initial public offering, Marvel stock was trading at $65 a share and Perelman began expanding the company's operations. Marvel entered the sports trading card market by acquiring Fleer Corp. for $286 million. In April 1993, Marvel acquired a 46% interest in Toy Biz, Inc. in exchange for, in part, a perpetual, royalty-free license to make toys using Marvel characters. In August 1994, Marvel entered the children's activity sticker market in Europe through its acquisition of an Italian company, Panini S.r.l., for $158 million. Finally, in April 1995, Marvel acquired an entertainment trading card company, SkyBox International Inc. for $165 million.

## C. *The Marvel Holding Company Notes*

It was during this period of expansion in the early 1990s that the Marvel Holding Companies issued a series of notes that are the subject of this action.

### 1. *The Holdings Note Sale*

On March 26, 1993, Perelman commenced a tender offer to increase his ownership of Marvel through Parent by 20% of the outstanding common stock. After the tender offer, Perelman hoped to own 80% of Marvel's outstanding stock because that would allow him to consolidate Marvel's tax returns with those of the Parent Companies.

In order to finance the tender offer, the board of directors of Parent, consisting of Perelman, Bevins and Drapkin, formed a new wholly-owned subsidiary, Holdings, and contributed 50.1% of Marvel's outstanding common stock to Holdings. On April 22, 1993, Holdings issued zero coupon notes with a face amount of $517,447,000 and an effective yield of 11.25% (the "Holdings Notes"). The Holdings Notes were due on April 15, 1998.

The Holdings Notes were secured by 24 million shares of Marvel stock that Holdings owned. The 24 million shares represented approximately 50.1% of the outstanding common stock of Marvel. At closing, Merrill Lynch, Pierce, Fenner & Smith Inc. provided a certificate of fair value to the indenture trustee of the Holdings Notes certifying that, based on the closing price of Marvel stock on April 21, 1993, the fair value of the collateral for the Holdings Notes was $594 million, or $77 million more than the face value of the notes. The Marvel stock that Holdings pledged to the trustee was not registered with the Securities and Exchange Commission and bore a restriction prohibiting its sale in the public market.

The Holdings Notes were governed by an indenture dated April 15, 1993. The parties to the indenture were Holdings and NationsBank, as indenture trustee. The indenture contained the following provision:

*No Recourse Against Others.* A director, officer, employee or stockholder, as such, of the Company or the Trustee shall not have any liability for any obligations of the Company or the Trustee under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligation or their creation. By accepting a Security, each Securityholder shall waive and release all such liability. The waiver and release shall be part of the consideration for the Issue of the Securities.

After Holdings received net proceeds of $289 million from the note sale, the board of directors of Holdings, consisting of Perelman, Bevins and Drapkin, determined that the company had a surplus of $583 million based in part on the market price of Marvel's stock. As a result, the board declared a dividend of $288 million which Holdings paid to its sole shareholder, Parent.

Perelman used the $288 million from the dividend to purchase more Marvel stock through Parent. In the tender offer on May 10, 1993, Parent purchased $10 million of Marvel stock at $30 per share. As a result of the tender offer, Parent owned 28.9% of Marvel.[3] In addition, Parent owned 100% of its subsidiary, Holdings, and Holdings in turn owned 50.1% of Marvel.

### 2. The Parent Note Sale

In the fall of 1993, as Marvel continued to prosper, Perelman decided to offer additional high-yield bonds secured by Marvel stock. On October 20, 1993, Parent issued zero coupon notes with a face amount of $251,678,000 and an effective yield of 11.875% (the "Parent Notes"). The Parent Notes were due on April 15, 1998.

The Parent Notes were governed by an indenture dated October 1, 1993. The parties to the indenture were Parent and NationsBank, as indenture trustee. The indenture included a no recourse provision identical to the corresponding provision in the Holdings indenture.

The Parent Notes were secured by 10 million shares of Marvel stock owned by Parent and all of the outstanding stock of Holdings. The 10 million shares represented approximately 21% of the outstanding common stock of Marvel. At closing, Bear, Stearns & Co. provided a certificate of fair value to the indenture trustee of the Parent Notes certifying that, based on the closing price of Marvel stock on October 19, 1993, the fair value of the Marvel shares pledged as collateral for the Parent Notes was $489 million, or $237 million more than the face amount of the notes. The Marvel stock that Parent pledged to the trustee was restricted and could not be traded on the public market.

As soon as Parent received net proceeds of $145 million from the note sale, the board of directors of Parent, consisting of Perelman, Bevins and Drapkin, determined that Parent had a surplus of $315 million based in part on the market price of Marvel's stock. As a result, the board declared a dividend of $145 million which Parent paid to its sole shareholder, Four Star.

### 3. The Marvel III Note Sale

The third and final note sale at issue occurred in February, 1994. Prior to the note sale, the board of directors of Four Star, consisting of Perelman, Bevins and Drapkin, formed a new wholly-owned subsidiary, Marvel III, and contributed 100% of Parent's outstanding common stock to

**3.** After the March 26, 1993 tender offer, Perelman, through Parent, acquired additional shares of Marvel, raising Parent's stake in Marvel to approximately 30.5%.

Marvel III. On February 18, 1994, Marvel III issued zero coupon notes with a face amount of $125,000,000 and an effective yield of 9.125% (the "Marvel III Notes"). The Marvel III Notes were due on February 15, 1998.

The Marvel III Notes were governed by an indenture dated February 15, 1994. The parties to the indenture were Marvel III, Parent and NationsBank, as indenture trustee. The indenture included a no recourse provision substantially the same as the corresponding provisions in the Holdings and Parent indentures. The Marvel III indenture stated:

> *No Recourse Against Others.* A director, officer, employee or stockholder, as such, of the Company, Guarantor or the Trustee shall not have any liability for any obligations of the Company, the Guarantor or the Trustee under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligation or their creation. By accepting a Security, each Securityholder shall waive and release all such liability. The waiver and release shall be part of the consideration for the Issue of the Securities.

The guarantor of the Marvel III Notes was Parent.

The Marvel III Notes were secured by 9.3 million outstanding shares of Marvel stock owned by Parent that had not been pledged to secure the Parent Notes. The 9.3 million shares represented approximately 9.5% of the outstanding common stock of Marvel. At closing, the indenture trustee of the Marvel III Notes received a certificate of fair value from Merrill Lynch certifying that, based on the closing price of Marvel stock on February 7, 1994, the fair value of the Marvel shares pledged as collateral for the Parent guarantee was $250 million, or $125 million more than the face amount of the Marvel III Notes. The Marvel stock that Parent pledged to the trustee was restricted and could not be traded on the public market.

The same day that Marvel III received net proceeds of $121 million from the note sale, the board of directors of Marvel III, consisting of Perelman, Bevins and Drapkin, determined that Marvel III had a surplus of $1.5 billion based in part on the market price of Marvel's stock. As a result, the board declared a dividend of $121 million which Marvel III paid to its sole shareholder, Four Star.

### D. *The Decline of Marvel*

In 1994, Marvel's operations began to deteriorate, in part due to lower comic book sales which reduced Marvel's comic book revenues. The company's situation was compounded by the Major League Baseball players' strike that cut short the 1994 season. Additional labor problems in hockey and basketball affected Marvel's return on the sports trading card business.

By the end of 1996, Marvel's stock had plummeted from a high of $65 a share in 1992 to less than $3 a share. Marvel failed to satisfy certain financial covenants in credit agreements with its secured bank lenders. Marvel's cash revenues were depleted and the company was unable to fund operations. As a result, Perelman, Bevins, Drapkin and the other senior management of Marvel and the Parent Companies sought to restructure the company.

### 1. *The Andrews Proposal*

On November 12, 1996, the board of directors of Andrews developed a plan to restructure Marvel (the "Andrews Proposal"). Under the Andrews Proposal, Marvel would issue new stock to Andrews at approximately $0.85 a share. Through Andrews, Perelman would purchase enough stock to acquire an 80% stake in a

restructured Marvel in exchange for $350 million in cash or an equal value of shares of Toy Biz. As a result, the Andrews Proposal would dilute the value of the stock that the Marvel Holding Companies pledged as collateral for the notes. On December 27, 1996, CS First Boston issued an opinion advising the Marvel board of directors that the consideration to be received by Marvel under the terms of the Andrews Proposal was fair.

At that time, Marvel already owned 46% of the outstanding common stock of Toy Biz. Andrews had agreements in place to purchase the remaining stock in Toy Biz, contingent upon Marvel's acceptance of the Andrews Proposal. On December 24, 1996, Wasserstein Perella & Co. issued an opinion advising the Toy Biz board of directors that the Andrews Proposal was fair to the shareholders of Toy Biz.

Under the Andrews Proposal, Perelman contemplated that Marvel would be restructured to allow the company to obtain additional borrowing capacity under its credit agreements. Moreover, the Marvel stock acquired by Andrews pursuant to the proposal would not be subject to liens under the Marvel Holding Company indentures. In order to restructure Marvel to meet these requirements, the board of directors of Marvel declared bankruptcy.

### 2. The Marvel Bankruptcy

On December 27, 1996, Marvel and the Marvel Holding Companies filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Marvel's proposed reorganization plan, based on the Andrews Proposal, was filed the same day. The success of the Andrews Proposal depended on Marvel's emergence from bankruptcy within three months.

The bankruptcy took much longer than three months. What started as a relatively friendly bankruptcy managed by Perelman and Marvel's secured lenders, turned into a massive commercial dispute after the noteholders, led at times by LaSalle and by Carl C. Icahn, took control of the Marvel Holding Companies and replaced Marvel's board of directors. The noteholders rejected the Andrews Proposal. It was not until July 31, 1998 that the court entered an order approving a plan of reorganization for the companies.

### E. The Lawsuit

#### 1. LaSalle's Complaint

On December 8, 1997, LaSalle filed a complaint in this court seeking to collect on the amounts due on the notes. LaSalle later amended the complaint to state twelve counts against the Perelman Group.

Counts I through VI alleged that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders when they used proceeds from the notes to pay dividends to the Parent Companies. Counts I, III and V alleged that the dividends violated 8 Del. C. §§ 170, 173 and 174 because the Marvel Holding Companies were insolvent when they paid the dividends. Counts II, IV and VI alleged that the dividends constituted wrongful transfers under Delaware common law. LaSalle also alleged that Perelman and the Parent Companies were unjustly enriched when they retained the dividends.

In Count VII, LaSalle contended that the court should pierce the corporate veil of the Marvel Holding Companies and each of the Parent Companies and hold Perelman, as Mafco's sole shareholder, liable for the amounts due on the notes. Count VIII alleged that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders under Delaware law by "upstreaming" the proceeds of the note sales,

filing bankruptcy petitions for the Marvel Holding Companies and submitting the Andrews Proposal. Count IX alleged that the officers and directors of the Parent Companies aided and abetted those breaches of fiduciary duties.

Count X alleged that Perelman and the other individual defendants interfered with the noteholders' contractual rights under the indentures by filing bankruptcy petitions for the Marvel Holding Companies and announcing the Andrews Proposal. In Count XI, LaSalle contended that it was entitled to assert a constructive trust or equitable lien on the proceeds of the notes to remedy the unjust enrichment by Perelman and the Parent Companies. Finally, Count XII alleged that the defendants committed civil conspiracy by conspiring to upstream the proceeds of the note sales.

### 2. The Perelman Group's Answer

On December 3, 1999, the Perelman Group filed its answer denying the allegations in LaSalle's complaint and asserting a number of affirmative defenses. It also set forth five counterclaims. The first counterclaim alleges that LaSalle intentionally breached the Marvel III indenture by filing claims in violation of the indenture's no recourse provision. The second and third counterclaims allege the same violation with respect to the Parent and Holdings indentures. The fourth counterclaim requests contribution in the event that members of the Perelman Group are found liable. The fifth counterclaim requests that the court recognize a right to setoff if members of the Perelman Group are found liable.

### 3. The February 7, 2000 Decision

On October 29, 1999, the Perelman Group moved for summary judgment as to all of LaSalle's claims. On February 7, 2000, the court granted summary judg-

ment in favor of the Perelman Group on all counts. *See LaSalle National Bank v. Perelman*, 82 F.Supp.2d 279 (D.Del.2000).

### 4. The Counterclaims

On March 3, 2000, LaSalle moved for summary judgment on the Perelman Group's five counterclaims. In support of its motion, LaSalle argues that in filing its amended complaint, it did not violate the no recourse provisions of each indenture because such provisions are limited to contract claims. LaSalle contends that its claims were equitable or tortious in nature and thus, not subject to the no recourse provisions.

LaSalle further argues that in accordance with Section 7.01(c)(3) of each indenture, it cannot be held liable for breach of contract for instigating the action so long as it acted in good faith and as directed by the noteholders. LaSalle contends that the Perelman Group cannot enforce the provisions because it engaged in misconduct in capacities different from those contemplated by the provisions. LaSalle further contends that the members of the Perelman Group are merely incidental beneficiaries of the provisions. Finally, LaSalle argues that counterclaims four and five are moot in light of the court's February 7, 2000 grant of summary judgment in favor of the Perelman Group.

The Perelman Group responded to LaSalle's motion and moved for cross-summary judgment. In support of its motion, the Perelman Group reiterates its position that LaSalle breached the no recourse provision in each indenture, and argues that the no recourse provisions are not limited to contract claims. In the alternative, the Perelman Group argues that even if the no recourse provisions are limited to contract claims, at least one of LaSalle's claims is in fact contractual. It further argues that its members are intended third-party benefi-

ciaries of the no recourse provisions. Finally, the Perelman Group contends that LaSalle's instigation of the action is not protected by the terms of the indentures.

## II. *DISCUSSION*

### A. *Choice of Law*

■ The Holdings, Parent and Marvel III indenture agreements contain choice of law provisions, which require that New York law govern disputes based on the indentures. Despite these provisions, the court applied Delaware law in evaluating LaSalle's claims in *Perelman* because the claims concerned the conduct of officers, directors and controlling shareholders of the Marvel Holding Companies, and not obligations pursuant to the indentures. *See id.* at 289. The remaining counterclaims, however, are for breach of the no recourse provisions set forth in the indentures.[4] Thus, New York law governs this dispute.

### B. *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Id.* at 323, 106 S.Ct. 2548. When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could not lead a reasonable jury to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There are no genuine issues of material fact remaining in this case. As a result, the court will evaluate the parties' motions and enter judgment as a matter of law.

### C. *The No Recourse Provisions*

#### 1. *Do the No Recourse Provisions Bar Non–Contract Claims?*

■ The Holdings, Parent and Marvel III no recourse provisions exempt directors, officers and stockholders from liability "for any obligations of the Company or the Trustee under the Securities or the Indenture or for any claim based on, in respect of or by reason of such obligation or their creation." As a preliminary matter, the court finds that the language of the no recourse provisions is unambiguous, and therefore, the court will interpret the provisions as a matter of law without reference to extrinsic materials. *See e.g. Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.* 906 F.2d 884, 889 (2d Cir.1990) (deciding that rights under unambiguous indenture provision should be interpreted from terms of indenture and not from

---

**4.** The Perelman Group has conceded that the setoff and contribution counterclaims· are moot. Thus, only the breach of contract counterclaims remain at issue.

extrinsic evidence); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir.1982) (finding that interpretation of standard indenture provision is question of law rather than fact).

LaSalle argues that the no recourse provisions only bar contract claims despite their broad language. In support of its position, LaSalle refers the court to a number of cases for the proposition that under New York law, no recourse provisions similar to those at issue apply only to contract claims, not claims based on tort or equitable theories. In particular, LaSalle points to *Banker's Trust Co. v. Hale & Kilburn Corp.*, 84 F.2d 401, 405 (2d Cir.1936) and *Small v. Sullivan*, 245 N.Y. 343, 157 N.E. 261, 265 (1927) as examples of this limited application. LaSalle also refers extensively to more recent Delaware case law in support of its position.

The Perelman Group counters that the broad language of the no recourse provisions protects stockholders, directors and officers of the issuer from any liability relating to the notes. In support of its position, the Perelman Group refers the court to a number of cases, including *Caplan v. Unimax Holdings Corp.*, 188 A.D.2d 325, 591 N.Y.S.2d 28 (1992), and *Babbitt v. Read*, 236 F. at 42 (2d Cir.1916) for the proposition that New York courts interpret no recourse provisions similar to those at issue as barring non-contract claims. As with LaSalle, the Perelman Group relies heavily upon more recent Delaware case law in support of its position.

In *Bankers Trust*, a note agreement provided that "[n]o recourse shall be had to or against ... any past, present or future stockholder of the Company for payment of ... any such Notes." 84 F.2d at 405. The Court of Appeals for the Second Circuit explained that the no recourse provision did not "protect stockholders who so appropriate property of the corporation that its creditors are defrauded." *Id.* The court further explained that an actual allegation of fraud is not necessary to avoid the effect of the no recourse provision because "leaving [a corporation] incapable of discharging its debts is fraudulent in the eyes of the law."

The Perelman Group contends that *Bankers Trust* does not involve notes and indentures, nor does it concern the type of fully negotiated no recourse provision currently at issue. As a result, the Perelman Group argues that it is inapplicable in the present matter. The court disagrees. *Bankers Trust* does involve notes, and the fact that the no recourse provision was set forth in a "note agreement" as opposed to an "indenture" is of no practical significance. *See id.* Furthermore, there is no evidence that the no recourse provision in *Bankers Trust* was not fully negotiated.

In *Small v. Sullivan*, a trust agreement referred to by bonds contained the following no recourse provision:

> No recourse under or upon any obligation ... of this indenture ... shall be had against any incorporator, stockholder, officer or director of the company ... by the enforcement of any assessment or by any legal or equitable proceeding by virtue of any statute or otherwise. This indenture ... [and] bonds ... are solely corporate obligations, and no personal liability whatever shall attach to or be incurred by the incorporators, stockholders officers, or directors of the company ... because of the incurring of the indebtedness ....

245 N.Y. 343, 157 N.E. 261, 265 (1927). "Without attempting to state the meaning and extent of the no recourse clause," the New York Court of Appeals, found that the clause "could not cover the future fraudulent acts of the directors." *Id.* Moreover, the Court stated that "[t]he directors could not willfully and fraudulently

destroy ... the property held as security for these bonds ... and then plead that they were protected by an agreement that they should not be liable for their future acts. The agreement did not relate to such future acts." *Id.* The Perelman Group fails to adequately distinguish *Small.*

Delaware courts have come to similar conclusions more recently. In *Geyer v. Ingersoll Publications Co.,* a promissory note contained a no recourse provision stating that "no officer, director or agent of the Obligor shall have any liability hereunder ... but, instead, all parties shall look solely to the property and assets of Obligor for satisfaction of claims of any nature arising under or in connection with [the note]." 621 A.2d 784, 793 n. 6 (Del. Ch.1992). The *Geyer* court determined that the provision barred only contract claims. *See id.* The Perelman Group recognizes the court's limitation, but argues that the word "hereunder" limited the no recourse provision to contract claims. It contends that the no recourse provisions at issue are distinct in that they contain no such limiting terms.

The *Geyer* court, however, simply stated that the "no recourse provision does not bar equitable claims," and never discussed the effect of the word "hereunder" on the scope of the provision. *Id.* In fact, it only set out the actual language of the no recourse provision in a footnote to the opinion. *See id.* Thus, this court concludes that the *Geyer* court did not rely on the word "hereunder" or any specific language of the provision in limiting the provision to contract claims. Instead, the Chancery Court generally held that no recourse provisions are limited to contract claims, a position more thoroughly explained in *Mabon, Nugent & Co. v. Texas Am. Energy Corp.* C.A. No. 8578, 1988 WL 5492, at *1 (Del. Ch. Jan. 27, 1988).

In *Mabon,* a trust indenture contained a no recourse provision stating that "[n]o recourse shall be had for the payment of the principal or premium ... on any Debenture or for any claim based thereon or otherwise in any manner in respect thereof, or in respect of this Indenture ... all such liability being expressly waived and released ...." *Id.* at *3. The *Mabon* court determined that the no recourse provision applied only to contract claims. *Id.* In limiting the provision, the *Mabon* court explained that "[r]estrictive indenture provisions have been enforced by our courts where the claim is one for breach of contract." *Id.* (citing *Simons v. Cogan,* 542 A.2d 785 (Del.Ch. 1987)). The court further explained that "equitable claims [were] not barred by the Indenture." *Id.*

The Perelman Group again recognizes the court's limitation, but argues that the no recourse provisions at issue are much broader than the provision in *Mabon* because the present provisions bar "claims arising 'by reason of creation' of the debentures." The Perelman Group, however, fails to explain how the phrase "claims arising 'by reason of creation' of the debentures" is any broader than the phrase "claim[s] based thereon or otherwise in any manner in respect thereof, or in respect of this Indenture." The court finds that these passages are similarly broad.

Despite this authority, the Perelman Group urges this court to ignore *Banker's Trust, Small, Geyer* and *Mabon,* and instead look to *Caplan* and *Babbitt* for guidance. In *Caplan,* the New York Supreme Court explained that a no recourse provision could limit remedies for non-payment under a contract. 188 A.D.2d 325, 591 N.Y.S.2d 28, 29 (N.Y.Sup.Ct.1992). The court further found that an "[i]ndenture providing a limited release against all but defendant corporation [was] not violative of public policy." *Id.* The Perelman Group

argues that *Caplan* extends the protection of no recourse provisions like those at issue beyond contract claims. A claim for non-payment, however, is a breach of contract claim. *Caplan* concerns claims for nonpayment, and as such, it does not address the issue of whether no recourse provisions may bar non-contract claims. Moreover, *Babbitt* does not apply in this instance because it is an application of Missouri law, not New York law. *See* 236 F. at 42, 43 (2d Cir.1916).

The Delaware cases referenced by the Perelman Group are equally unhelpful. *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, C.A. No. 9032, 1988 WL 63491 (Del. Ch. June 21, 1988), and *Feldbaum v. McCrory Corp.*, C.A. No. 11866, 1992 WL 119095 (Del.Ch. June 1, 1992), do not support the Perelman Group's counterclaims. In fact, *Shenandoah* supports LaSalle's interpretation of the effect of no recourse provisions in stating that "[w]hen the action is for breach of contract and not for fraud in the inducement of the investment, [no recourse] provisions ... are effective to limit any liability that may be found to the issuer." 1988 WL 63491, at *9. The Perelman Group's argument that this statement somehow requires plaintiffs to claim fraud in the inducement of an indenture in order to avoid preclusion is plainly incorrect.

*Feldbaum* is equally unsupportive because it involves a no action provision rather than a no recourse provision. *See* 1992 WL 119095, at *5. No action provisions generally require that security holders satisfy certain criteria before bringing a suit without authorization of a trustee appointed to protect their interests. *See Mabon*, 1988 WL 5492, at *2–3 (describing indenture containing both no action and no recourse provisions and noting that no action provision requires written demand for trustee to take action before bondholders

could bring suit). Such was the case in *Feldbaum*, where the no action provision did not bar claims, but instead established five criteria requiring that the indenture trustee decline to pursue an action before bondholders could bring suit independently. *See* 1992 WL 119095, at *5. Examples of the criteria included requirements that the indenture trustee receive written notice of a continuing event of default and that the trustee have sixty days in which to decide whether to pursue a claim before bondholders took any further action. *See id.* If bondholders pursued a claim without satisfying the criteria, the no action provision barred the claim. *See id.*

The Perelman Group contends that the broad scope of the *Feldbaum* no action clause requires a broad interpretation of the no recourse provisions. For the reasons previously stated, however, the *Feldbaum* no action provision is fundamentally different than the no recourse provisions. Most significantly, the no action provision does not bar a certain type of claim. As a result, the court finds *Feldbaum* inapplicable to the present dispute.

In sum, the court finds that the no recourse provisions of the Holdings, Parent and Marvel III indentures are similar in scope to the no recourse provisions limited to contract claims in *Bankers Trust, Small, Geyer* and *Mabon.* Therefore, the court concludes that the no recourse provisions bar only contract claims.

### 2. Were Any of LaSalle's Claims Contractual?

■ Most of LaSalle's claims were clearly not based on LaSalle's rights under the indentures, and thus, they were not contractual. The Perelman Group, however, argues that Count VII of LaSalle's amended complaint was a contract claim. In Count VII, LaSalle argued that the Marvel Holding Companies were alter ego

vehicles for other Perelman affiliates. LaSalle urged the court to pierce through the corporate veil of the holding companies and extend liability to the affiliates. The Perelman Group contends that claims based on alter ego theory are inherently contractual. In response, LaSalle again refers the court to *Geyer* and *Mabon*, but this time for the proposition that alter ego claims are non-contractual.

In *Mabon*, the Chancery Court determined that alter ego claims were equitable and not contractual. *See* 1998 WL 5492, at *3. Similarly, the court described an alter ego claim as "distinct from a contract claim and ... equitable in nature" in *Geyer*. 621 A.2d at 793. The Perelman Group offers no contradictory authority. Thus, this court finds that Count VII of LaSalle's complaint was an equitable claim, and as such, it was not barred by the no recourse provisions.

III. *CONCLUSION*

In summary, there is no genuine issue as to any material fact in this dispute. Furthermore, relevant contract law limits the scope of the Holdings, Parent and Marvel III no recourse provisions to contract claims. None of LaSalle's claims were contractual. As a result, the no recourse provisions did not bar any of LaSalle's claims. The Perelman Group's counterclaims requesting rights to contribution and setoff are moot. The court will therefore grant summary judgment in favor of LaSalle and against the Perelman Group as to all counterclaims.

The court will issue an order in accordance with this opinion.